[No. A034203. First Dist., Div. Two. Dec. 9, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE PATRICK REILLY, Defendant and Appellant.

COUNSEL

Alys Briggs, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David D. Salmon and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SMITH, J.—We hold in this case that the prosecution met its burden, under the *Kelly/Frye* standard (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C.Cir. 1923) 293 F. 1013 [34 A.L.R. 145]), of showing (1) that electrophoretic testing of dried bloodstains has gained general acceptance in the scientific community and (2) that the technique was properly used in this case. We will therefore affirm the conviction of Lawrence Patrick Reilly for the second degree murders of Frank Anthony Ragusa, Jennifer Ann Ragusa and Marianne Jane Ragusa.

### BACKGROUND

The murders occurred on January 25, 1978, in the Oakland hills home of victims Frank Ragusa and wife Jennifer. The third victim was Frank's

sister, who was visiting. All three died of shock and hemorrhage from multiple stab wounds. Oakland police acting on a tip discovered the bodies at the house that same day.

The prosecution's theory was that defendant, perhaps pressured by others, used his longstanding friendship with Ragusa to gain access to the Ragusa house. Once inside, he and possibly others took a large amount of cash and stabbed all three victims to death.

Ragusa was a major LSD producer and seller. He often kept large amounts of cash—up to $100,000—locked in a file cabinet in the house. Defendant, a friend of Ragusa's since childhood, had dealt drugs for him and would have known about the cash. The house was well secured against intruders, and lack of forced entry suggested that the victims knew their killer.

Sometime in the month before the incident, defendant approached a county drug-task-force officer, seeking police protection. Describing Ragusa as "a heavy dude" who was into LSD ("acid"), defendant said he was afraid he was being followed because of his association with Ragusa. The officer explained that he could not provide protection but advised contacting the federal drug enforcement agency. Apparently acting on that advice, defendant approached a federal agent in San Francisco about two weeks before the incident. He told the agent that Ragusa was a major LSD dealer and was out to kill him. Defendant wanted Ragusa arrested, but the agent responded that there would first have to be an investigation and asked if defendant would be willing to help. Defendant refused. When the agent declined to do anything, defendant grabbed some notes the agent had been taking and, with a look of rage or terror on his face, walked out. That same month, defendant confided to a neighbor in San Rafael that someone was following him and that people were pressuring him to help set Ragusa up. According to the neighbor, defendant said he had no choice—"either he would be rich or he would be dead."

Four to eight hours after the murders, defendant attempted suicide at an ex-girlfriend's cottage in Vallejo by slashing his arm. After he had been taken away by ambulance, bloodied pieces of a shirt were found in the cottage bathroom, and more pieces were found in the toilet, which backed up and overflowed when someone tried to flush it. Workers called in to unclog the toilet a week later discovered the sewer line blocked with cut-up currency and a plaid shirt of the kind that defendant habitually wore.

The most damaging single piece of evidence was a bloody fingerprint found on the gummed flap of a gray envelope discovered in the Ragusas'

kitchen, on top of a dishwasher. The print was defendant's, and the envelope, one like those Ragusa used to store cash, was presumably taken from the file cabinet and emptied.

The evidence at issue in this case concerns dried bloodstains found in various places throughout the house—in particular, certain bloodstains which were typed through electrophoresis and other processes as excluding any of the victims and statistically including defendant as a source. There were three such stains: blood on a tissue found in the living room, a blood chip taken from the den floor, and blood on a nasal spray bottle found in the bathroom. The tissue tested positively for three genetic markers, the blood chip for four, and the nasal spray bottle for five. The statistical frequency with which those markers cumulatively occur in the white population, for each of the items, was 3 percent, 1.2 percent and 1 percent, respectively. Defendant is white, and so were the victims.

Other bloodstains, which could have come from either defendant or Jennifer Ragusa, were taken from the kitchen floor, a stairwell, a bedroom wall and a bidet. Still other stains were typed as probably coming from the victims and definitely not from defendant. Blood on the gray envelope was typed only as being of human origin.

The defense rested without calling witnesses.

This is defendant's second jury trial conviction for the same acts. By a two-to-one decision filed in March 1985 (*People* v. *Reilly,* A010779, Rouse, J., dis.), we reversed the first conviction, finding prejudicial error in the admission of the blood typing evidence because the record did not satisfy *Kelly/Frye* standards. Now, after retrial and a much more extensive record on the *Kelly/Frye* issue, defendant appeals again, raising that issue as his sole contention. He was sentenced to 12 years in state prison for 3 counts of second degree murder (Pen. Code, §§ 187, 189) and findings that he personally used a deadly weapon, a knife, in each murder (*id.,* § 12022, subd. (b)). (See *id.,* former § 190; Stats. 1977, ch. 316, § 5, pp. 1256-1257.)

APPEAL

I

■ In California courts, "[the] admissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Cita-

tions.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*People* v. *Kelly, supra,* 17 Cal.3d 24, 30 (*Kelly*).) Reliability for this purpose means that the technique " 'must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' " (*Ibid.,* quoting *Frye* v. *United States, supra,* 293 F. 1013, 1014.) Despite some criticism of the "general acceptance" test, our courts adhere to it because it ensures that the validity of a technique is assessed by those most qualified to do so, it promotes uniformity of decision, and it hinders the admission of evidence based on new and possibly unaccepted principles that a lay juror might trust uncritically. (*Id.,* at pp. 30-32.)

■ The question of how to characterize the "general acceptance" issue under *Kelly/Frye* for purposes of defining appellate review of a trial court's determination has not been clearly stated in the case law. We believe, however, that "general acceptance" is best described as a mixed question of law and fact subject to limited de novo review. The issue, recently paraphrased as whether "a consensus of scientific opinion has been achieved" (*People* v. *Brown* (1985) 40 Cal.3d 512, 532 [230 Cal.Rptr. 834, 726 P.2d 516] (*Brown*), reversed on unrelated grounds in *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), is factual but not entirely so for purposes of review. The trial court's determination cannot be sustained, for example, on a mere finding that the record contains " 'sufficient evidence' " of the reliability of the challenged method. (*People* v. *Shirley* (1982) 31 Cal.3d 18, 54, fn. 32 [181 Cal.Rptr. 243, 641 P.2d 775] (*Shirley*), cert. den., 459 U.S. 860 [74 L.Ed.2d 114, 103 S.Ct. 133].)

The reviewing court undertakes a more searching review—one that is sometimes not confined to the record. Because it is impractical to parade a true cross-section of scientists before the court, the scientific literature may be considered on the ultimate issue of consensus. "[F]or this limited purpose scientists have long been permitted to speak to the courts through their published writings in scholarly treatises and journals. [Citations.] The courts view such writings as 'evidence,' not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community. . . . [I]f a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose [the technique], the court may safely conclude there is no such consensus at the present time." (*Shirley, supra,* 31 Cal.3d at p. 56.) Law articles, too, may be considered for that purpose. (*Kelly, supra,* 17 Cal.3d 24, 35.) This looking beyond the record can help end case-by-case controversy on the subject (*Brown, supra,* 40 Cal.3d 512, 533) and is especially justified by the realization that "once a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the

precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community" (*Kelly, supra,* 17 Cal.3d at p. 32).

On the other hand, a court should ordinarily confine itself to the record on matters of a highly complex nature. "Often . . . the technical complexity of the subject matter will prevent lay judges from determining the existence, degree, or nature of a scientific consensus or dispute without the interpretive assistance of qualified live witnesses subject to a focused examination in the courtroom. It is for this reason that *Kelly/Frye* emphasizes the record made in the trial court." (*Brown, supra,* 40 Cal.3d 512, 533.) In *Brown,* where the issue was the general acceptance of electrophoretic testing of dried *semen* stains, our Supreme Court found the subject too complex for an independent, unaided technical review. (*Id.,* at p. 534.)

Of course, a court should examine relevant decisions from other jurisdictions on the question of consensus (see, e.g., *id.,* at pp. 531-532), bearing in mind that the needed consensus is that of scientists, not courts. (See Note, *The Admissibility of Electrophoretic Methods of Genetic Marker Bloodstain Typing Under the Frye Standard* (1986) 11 Okla. City U. L.Rev. 773, 804 & fn. 212.)

We conclude that a technique's "general acceptance" in the scientific community poses a mixed question of law and fact rather than a pure question of fact. Thus, we review the trial court's determination with deference to any and all supportable findings of "historical" fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance. ▮▮▮▮ (*People* v. *Louis* (1986) 42 Cal.3d 969, 984-987 [232 Cal.Rptr. 110, 728 P.2d 180]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)[1]

## II

The trial court held an extensive pretrial hearing spanning eight days of testimony and ruled that electrophoretic typing of dried bloodstain evidence

---

[1] Having said that, we note as a practical matter in this case that the trial court apparently found all witnesses to be credible. As to the prosecution's witnesses, that much is implicit in the court's favorable ruling. As to the defense's principal witness, Dr. Benjamin Grunbaum, the court expressly found that he was "honest and sincere" despite concluding that his views found "little or no support among his colleagues."

Two further express findings by the court are of no assistance to us. A threshold finding that electrophoretic testing of blood stains is not a "new technique" for *Kelly/Frye* purposes was contradicted by the Supreme Court in *Brown* shortly after the ruling. (*Brown, supra,* 40 Cal.3d 512, 534.) A further finding, that the technique is "in fact reliable," was beyond the trial court's realm. Its duty was "*not* to decide whether [the technique] is reliable as a matter of 'scientific fact,' but simply whether it is generally accepted as reliable by the relevant scientific community." (*Shirley, supra,* 31 Cal.3d 18, 55.)

has found the general acceptance or consensus required under *Kelly/Frye*. The issue breaks down into several subissues.

### The technique in question

It is first important to put the precise issue in perspective because defendant challenged only part of the blood typing done in this case. Not challenged is the typing done for the ABO genetic marker system. Depending on whether a blood sample is dried or liquid, ABO typing is done either by an absorption-elution or a direct agglutinization method, but neither method involves electrophoresis.

Also, not all of the electrophoretic testing done in this case is challenged. Those tests run on *liquid* blood samples drawn from defendant and from the bodies of the three victims, soon after their deaths, are not disputed. Defendant concedes "the reliability of electrophoretic testing of fresh, liquid blood, drawn under laboratory conditions, deposited on clean materials." The liquid samples in this case were electrophoretically tested for eight different genetic marker systems.

The challenge is limited to electrophoretic testing of *dried* blood samples collected from the crime scene—and in particular, those three samples which implicated defendant. As to each of those three samples, testing was done, at most, for only four of the genetic marker systems that were run on the liquid blood samples. The disputed dried-blood typing was for phosphoglucomutase (PGM), erythrocyte acid phosphatase (EAP), haptoglobin (Hp), esterase D (EsD), and glyoxylase (GLO).[2]

Defendant thus does not maintain that electrophoresis as a method *in general* lacks acceptance or reliability. His argument is that the method is

[2] Discussion of the three marker systems typed only on the liquid samples—adenylate kinase (AK), adenosine deaminase (ADA), and 6-phosphogluconate dehydrogenase (6-PGD)—is unnecessary. Moreover, as it turns out, defendant and all three victims tested identically for those systems in the undisputed, liquid blood tests.

The following chart shows the results of the five disputed tests on the liquid samples and the three critical bloodstains, plus ABO typing. A question mark (?) indicates an inconclusive result, and dashes (—) indicate that the test was not run. In parentheses are the percentages of the white population from which the bloodstains could have come.

| | ABO | PGM | EAP | Hp | EsD | GLO | |
|---|---|---|---|---|---|---|---|
| Frank Ragusa | B | 2-2 | BA | 2-2 | 1-1 | 2-1 | |
| Jennifer Ragusa | A | 2-2 | BA | 2-2 | 2-1 | 2-1 | |
| Marianne Ragusa | A | 1-1 | BB | 2-2 | 1-1 | 2-1 | |
| Lawrence Reilly | A | 1-1 | BB | 1-1 | 1-1 | 2-1 | |
| tissue | A | 1-1 | ? | 1-1 | ? | — | (3.0%) |
| blood chip | A | 1-1 | BB | 1-1 | — | ? | (1.2%) |
| nasal spray bottle | A | 1-1 | BB | 1-1 | 1-1 | — | (1.0%) |

not accepted as applied to "dried, aged evidence samples taken from whatever surface they may fall upon at the scene of a crime . . . ." As will be seen, his concern is over whether serologists who apply the tests can adequately account for the effects of blood-sample deterioration and crime-scene contaminants.

Finally, defendant does not challenge the use of statistical data to show what percentage of the population is likely to share, singly or in combination, particular genetic markers. (*State* v. *Washington* (1981) 229 Kan. 47 [622 P.2d 986, 994-995]; *Graham* v. *State* (1983) 168 Ga.App. 23 [308 S.E.2d 413, 413-414]; see Selvin, *Statistical Analysis of Blood Genetic Evidence,* in Handbook for Forensic Individualization of Human Blood and Bloodstains (Grunbaum edit. 1981) (hereafter cited as Handbook) 177-211.) With that in mind, we turn to the record for a general description of electrophoresis.

Electrophoresis is a method for separating charged molecules, and its use for detecting genetic markers in blood is mechanically uncomplicated. "[A] test sample is placed on a gel medium in an ionized buffer solution. When an electric current is run through the solution, the sample separates and migrates on the medium into characteristic patterns. These are then fixed, dyed, and read visually by the analyst. (See Jonakait, *Will Blood Tell?* (1982) 31 Emory L.J. 833, 836-842.)" (*Brown, supra,* 40 Cal.3d 512, 529.)

Of the many genetic marker systems that have been identified in blood, only about a dozen are currently considered useful in typing dried as opposed to liquid blood. This is because some markers do not "persist" well— i.e., they lose mobility—in the dried state. One of the more persistent markers is the red cell antigen system ABO, which is *not* tested through electrophoresis. The others are polymorphic enzyme or protein marker systems, which include the five systems (PGM, EAP, Hp, EsD and GLO) at issue in this case. (Grunbaum, *Potential and Limitations of Forensic Blood Analysis,* in Handbook, *supra,* at p. 3.) The basic electrophoretic process is the same whether for liquid or dried blood. Depending on the particular marker being tested, there will be variations in the buffer solution, the amount of electric current, the length of time allowed for separation and migration, the type and thickness of the gel (medium), and the catalytic agent used for staining. Predetermined sets of these variations, called protocols, are developed for each marker.

The characteristic pattern of a marker displays itself in the finished gel (the electrophoretogram) as a series of bands. The pattern for each marker is distinct because each protein or enzyme carries a slightly different charge, causing it to migrate through the gel at a different rate. Test results are read

visually according to the color, number, position and relative intensity of the bands. Several gels are usually tested at one time on a single "plate." Samples of known types ("controls" or "standards"), screened beforehand to determine degrees of genetic variance, are often included for comparison of banding and to ensure that enough time has been allowed for separation. The control or standard thus acts to safeguard against mistyping. Other safeguards include repeating tests (the amount of sample permitting), having a second analyst independently interpret the gel, and photographing the gel for future reference (although it is preferable to read the gel directly and even better if the second analyst sees the development process as opposed to just the end result). The original gel is often hard to preserve. Because interpreting the results calls for some subjective judgment, the competence, experience and training of the analyst are important.

### Relevant scientific community

*Kelly/Frye* asks us to look for scientific consensus about a new technique from within " 'the particular field in which it belongs.' " (*Kelly, supra,* 17 Cal.3d 24, 30, quoting *Frye* v. *United States, supra,* 293 F. 1013, 1014.) The technique at issue here is electrophoretic typing of dried evidentiary bloodstains, as opposed to fresh ones of known history. While electrophoresis is widely used in the biochemical sciences generally, few scientists other than forensic chemists have occasion to test dried *evidentiary* bloodstains. (*Robinson* v. *State* (1981) 47 Md.App. 558 [425 A.2d 211, 220]; *People* v. *Young* (1986) 425 Mich. 470 [391 N.W.2d 270, 275].)

Nevertheless, to the extent that those scientists in broader disciplines are knowledgeable about bloodstain typing, their opinions should be considered as part of the relevant scientific community. Their related experience in electrophoretic work is bound to bring helpful insight. The trial court in this case took that view and thus considered the testimony of all witnesses, despite wide variation in their hands-on experience with dried bloodstain evidence.

 Defendant urges that we *disregard* the testimony of several prosecution witnesses because they assertedly are not "disinterested" for *Kelly/Frye* purposes. In order to be a "qualified witness" on the issue of scientific acceptance, "The witness must have academic and professional credentials which equip him to understand both the scientific principles involved and any differences of view on their reliability. He must also be 'impartial,' that is, not so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community. [Citation.]" (*Brown, supra,* 40 Cal.3d 512, 530.)

Defendant would have us disregard altogether any witness who has a professional interest in doing forensic electrophoresis work and is not a research scientist. We cannot do that. Criticism laid upon experts in some California cases has stressed the need to ensure that the court hears the views of the whole scientific community. Thus, in cases where the *sole* (or a *crucial*) witness has a significant financial or professional interest in promoting the new technique or lacks theoretical training, that witness's ability to speak for all concerned has been questioned. In *Kelly*, for example, a police lieutenant with impressive personal experience in voiceprint analysis but who lacked a formal degree in the speech or audiology sciences was the *sole* witness speaking on the acceptance of voiceprint identification. (*Kelly, supra,* 17 Cal.3d 24, 36.) The court noted that he was a leading proponent of voiceprint analysis who had "built his career on the reliability of the technique" and hence could not be expected to give a fair and impartial assessment. (*Id.,* at p. 38.) Also, his qualifications were rejected as "those of a technician and law enforcement officer, not a scientist." (*Id.,* at p. 39, italics deleted.) "Although the *Frye* test may be satisfied by a showing of general acceptance by those scientists who are most familiar with the use of a new technique [citations], such a showing, ordinarily, should be presented by those who are engaged in the scientific fields." (*Id.,* at p. 40.)

Similarly, in *Brown,* where the issue was the typing of semen stains by electrophoresis, the People offered only the testimony of two Department of Justice criminalists who had done the actual analysis in the case. (*Brown, supra,* 40 Cal.3d 512, 525.) The court concluded: "[They] were competent and well-credentialed forensic technicians, but their identification with law enforcement, their career interest in acceptance of the tests, and their lack of formal training and background in the applicable scientific disciplines made them unqualified to state the view of the relevant community of *impartial scientists.* [Citation.] Moreover, neither witness backed up his or her opinion with a discussion of the relevant scientific literature. [Citation.]" (*Id.,* at p. 533; see also *People* v. *Guerra* (1984) 37 Cal.3d 385, 417 [208 Cal.Rptr. 162, 690 P.2d 635] [article by a proponent of the technique dismissed as a "frontal assault" on a prior decision rather than an objective report]; *Seering* v. *Dept. of Social Services* (1987) 194 Cal.App.3d 298, 313 [239 Cal.Rptr. 422] [sole witness presented only an article by a former colleague].)

Our situation is different. While all of the witnesses (including defendant's) might be criticized as having some professional interest in the technique's acceptance, they did not have the degree of self-interest that renders their testimony flatly unacceptable. As the Michigan Supreme Court recently concluded in an electrophoresis case, commenting on Drs. George Sensabaugh and Benjamin Grunbaum, two of the same witnesses who testified

here, "[A] certain degree of 'interest' must be tolerated if scientists familiar with the theory and practice of a new technique are to testify at all." (*People* v. *Young, supra,* 391 N.W.2d 270, 275; cf. *People* v. *Williams* (1958) 164 Cal.App.2d Supp. 858, 862 [331 P.2d 251].) Also, while some of the witnesses here were "technicians," none had the dearth of academic background or awareness found in *Kelly* or *Brown.* On these two points—self-interest and being "mere" technicians—we defer to the trial court's oral findings and comments.[3]

Each witness's credentials are set out in the summary of their testimony which follows. The important point with regard to disinterest is that the court had before it a broad range of backgrounds. It was able to assess general acceptance through their *combined* testimony regardless of any shortcomings that any of them would have suffered as a *sole* spokesperson for the general scientific community. The court did not limit its inquiry to particular witnesses but, instead, found that the "totality" of witnesses constituted the relevant field. We agree. It would be a strange perversion of *Kelly/Frye* to exclude the opinions of analysts, at least well-credentialed ones. Those who work closest to a technique may be uniquely aware of inherent reliability problems. Also, it was particularly important to have actual analysts testify in this case because a major part of defendant's challenge was to the ability of analysts to differentiate between reliable and unreliable results.

*The testimony*

The only defense witness on the question of general acceptance was Dr. Benjamin Grunbaum, who testified as an expert in biochemistry and forensic serology. His background is summarized in *Brown,* where he submitted an amicus brief on behalf of the appellant: "Dr. Grunbaum holds a Ph.D. degree in biochemistry and a master's degree in criminology with a specialty in forensic identification. He has been employed by the University of California as a research biochemist for 30 years, specializing in analytical biochemistry and microanalysis, which includes the examination of body

---

[3] "For the record, I would state that all of the witnesses that testified were of assistance to the Court. Some may have been less impartial or less disinterested than others, but I felt generally that went to the weight rather than the admissibility. And contrary to [the defense's] position I do not feel I should strike or disregard any testimony. [¶] . . . [¶] The Court also felt that . . . it's reasonable to look to those who have some familiarity with the usage of a particular system or device, whatever you wish to call this genetic marker typing of dried samples. [¶] . . . We certainly can't ask the [technique's] validity of those who have no knowledge of it or haven't even experimented with it. So we do look to those who have knowledge in the field even though they may seem to have some partiality because of where they're coming from. I did not find that any of them were so partial [that] they should be disregarded."

fluids. [Citation.] He is a leader in the development of electrophoresis to test body-fluid enzymes for purposes of forensic identification, and is an author of the most-cited studies on the distribution of enzyme and antigen phenotypes in the population. [Citations.]" (*Brown, supra,* 40 Cal.3d 512, 532, fn. 4.) The bulk of his extensive work and many publications on electrophoresis has involved liquid or laboratory prepared stains, his only personal experience with typing evidence stains being defense work in two criminal cases where he retested bloodstains. Since his retirement from the university in 1981, he has been self-employed as a consultant in analytical chemistry.

Dr. Grunbaum's testimony echoed in part some concerns he has expressed in recent electrophoresis cases around the country. (See, e.g., *People v. Young, supra,* 391 N.W.2d 270 [Michigan]; *Brown, supra,* 40 Cal.3d 512; *State v. Pearson* (1984) 234 Kan. 906 [678 P.2d 605]; *State v. Washington, supra,* 622 P.2d 986 [Kansas].) The record shows that Dr. Grunbaum had given such testimony in 10 trials, in California and other states, during a 2-year period (July 1983 through June 1985) preceding his testimony here, as well as in trials before 1983.

Dr. Grunbaum maintains that electrophoretic typing of what he terms evidentiary bloodstains—that is, dried bloodstain evidence of unknown history (age, substrates, environment, etc.)—should be distrusted. "Reliability" to him is an absolute term meaning that the technique "can't miss," while having "confidence" in test results means allowing for "certain error that is inadvertent." (See same testimony in *People v. Young, supra,* 391 N.W.2d 270, 279, fn. 43.) In his view, results in which he could say he had "confidence" would "meet the test of scientific acceptance within the scientific community," although he did not identify anyone else in the scientific community who shares that view.

There is no dispute in this record that typing evidentiary bloodstains can be made more difficult, and often impossible, by the deteriorating effects of aging, improper preservation, and the presence of crime-scene contaminants. The heart of Dr. Grunbaum's testimony was his doubt whether analysts can accurately account for those possibilities and thus distinguish between reliable and unreliable results, or even testable and untestable samples.

However, his criticism was repeatedly qualified by noting that well-trained, competent analysts who use proper procedures and are aware of the published literature warning of typing problems *can* account for those possibilities. Of crime labs in the Bay Area, he expressed "confidence" in the work of the Alameda County Sheriff's Department Crime Laboratory, to which he had been a consultant for 10 years. Published articles, such as one

particular study that explored the effects of aging at different temperatures and humidities, and on different substrates (Denault et al., *Detectabilily of Selected Genetic Markers in Dried Blood on Aging* (1980) 25 J.Forensic Sci. 479), he testified, provide "very important warning[s]" about precautions an analyst should take. The literature is filled with warnings of potential reliability problems, "but we don't know who reads and who doesn't read, and if they read, . . . whether they follow directions or not. There's no way of knowing."

Dr. Grunbaum testified that he would have "confidence" in crime lab work on evidentiary bloodstains if minimal quality assurance guidelines, such as ones he has proposed (Grunbaum, *Physiological Stain Evidence; Guidelines to Assure Quality Analysis* (Spring 1985) Cal. Defender, p. 20 (hereafter Guidelines)), were made mandatory for all labs. His guidelines require, among other things, (1) licensing of analysts based on educational qualifications and internship training, (2) proficiency tests, with results made available to the defense and the trier of fact, (3) use of established protocols on the collection and storage of evidence, (4) analysis of samples within a week of receipt, (5) use of standards and controls as specified in written procedures, (6) duplicate runs and independent (blind) retesting, with any differences of opinion noted and called as "inconclusive," (7) reporting only clear and unambiguous banding patterns, (8) recordation of all test procedures, and (9) photographing all electrophoretograms. (*Id.,* at pp. 24-26.) He believes that if his guidelines were followed carefully, lab results would be "reliable in a scientific sense." He believes that unless his or more stringent guidelines are adopted, courts must assume that the work is unreliable. He acknowledged, however, that guidelines could not guarantee accurate results in every case.[4]

To support his claim of need for quality assurance, Dr. Grunbaum relied on his own experience and cited the results of certain voluntary proficiency tests, begun in 1975, that showed what he believed were unacceptably high error rates in general and particularly bad results for some laboratories.

---

[4] Dr. Grunbaum was cross-examined as follows:

"Q. . . . Isn't it true that your only concern is you don't know who's reading the information?

"A. Nobody knows.

"Q. And there's no way to tell if anybody's reading the information, right?

"A. That—you're right, yes.

"Q. And isn't it also possible that people who read the information and know what's in the information will intentionally perform the tests incorrectly?

"A. Yes.

"Q. Okay, so even reading and understanding all the pitfalls isn't going to solve the problem as you perceive it in that somebody might make a mistake or get an erroneous result?

"A. I think you're probably right on that, yes."

However, he explained: ". . . I don't condemn all laboratories in the United States . . . because many of them do very good work. I don't even condemn the laboratories that do produce errors. I think what's wrong is with the criminal justice systems that didn't require those laboratories to introduce . . . quality control measures to produce reliable results."

Dr. Grunbaum agreed with the proposition that a qualified and well-trained forensic serologist "who is aware of the problems discussed in the literature is not likely to report incorrect results or interpretations of readings. These determinations are reliable and scientifically acceptable if done correctly." As to problems of samples that are spoiled and degraded by contaminants, he testified that a trained analyst who has read the literature can detect that by viewing the electrophoretogram. Usually, you see a "blurry" pattern. Ideally, the police evidence technician at the crime scene should take a sample from an area beside the stain for lab comparison. As to problems of aging, you do not necessarily get "false" results. Many times you simply get nothing. Concerning possible misidentification, Dr. Grunbaum cited an experiment in which he and others performed EAP testing under simulated case work conditions of extreme heat plus aging. They discovered that differing rates of enzyme decay caused discrete (as opposed to blurry) bands that caused the misleading appearance of a "C" isoenzyme. (See Zajac et al., *Problems of Reliability in the Phenotyping of Erythrocyte Acid Phosphatase in Bloodstains* (1978) 23 J.Forensic Sci. 615.)

In summary, the defense evidence was that flaws in an analyst's knowledge and ability are what condemn the technique. Dr. Grunbaum agreed that "the methodology itself"—forensic bloodstain analysis—"has progressed to the point where it should be and can be reliable and scientifically accepted[.]" (See letter quoted in fn. 8, *post.*) The witness, while indicating some dissatisfaction with the amount of independently verified studies available, felt that the information currently available was enough to render the test results acceptable *provided* that the analyst knows and properly utilizes the information. Dr. Grunbaum asked, "[H]ow can the court or anybody guarantee that everybody working in the laboratory reads these signposts, warnings[?]" In his view, only the adoption of minimum guidelines for crime labs will render the technique acceptable.[5]

---

[5] Dr. Grunbaum explains in his published guidelines: "It would be inaccurate to suggest that there are no reliable methods available to American criminalists. There are methods that have been thoughtfully developed, principally by English forensic scientists, and have been subjected to rigorous testing to establish the limits of their reliability. *These methods are described in detail in the literature, with suitable warnings in regard to potential problems, and suitable instructions in regard to interpretation of results.* However, in many crime laboratories in the United States, the analyst is not required to possess or to follow a printed protocol, nor is he required to heed any instructions or warnings. There is no way of knowing what innovation he has made to a standard reliable method, and it is difficult to establish whether or

The People presented several witnesses who attested to the technique's general acceptance.

Edward Blake testified as an expert in forensic serology. His credentials include a doctorate in criminology from the University of California, where his emphasis was in the natural sciences and forensic biology. He studied under Dr. Grunbaum and Dr. George Sensabaugh (another of the People's witnesses in this case) during his work at Berkeley. After graduating in 1976, he did two years of postgraduate work with Dr. Sensabaugh. He has been a partner in a physical evidence consulting firm, Forensic Science Associates (FSA), since 1981 and has qualified as an expert in forensic serology in about 100 cases, testifying roughly half the time for the prosecution and the other half for the defense. His research work includes four years of grants from the United States Department of Justice, and his publications include many studies done in collaboration with Dr. Sensabaugh. He has extensive experience with electrophoretic typing of bloodstains and semen stains. He assisted Oakland Police Department Crime Laboratory Director Jan Bashinski with some of the stain analysis in this case and has collaborated with her on other occasions since then.

Dr. Blake testified that electrophoretic testing of bloodstain evidence is reliable when performed properly and is accepted in the scientific community of criminalists. He was unaware of any dissension on the point until he read Dr. Grunbaum's amicus brief in *Brown* and knows of no one who shares Grunbaum's views. Nor is he aware of any publications that indicate lack of reliability. In his view, Grunbaum mistakes published "signposts" of potential problems in particular contexts as a signal that the entire subject matter is unreliable. Blake also disagreed with the conclusions of an associate law professor, Randolph Jonakait, who has used some of his (Blake's) publications as support for a law review article criticizing the reliability of the technique as applied to bloodstain analysis.[6]

Dr. Blake agreed that the competency, training and experience of the analyst are an element of reliability, but he disputed Dr. Grunbaum's inter-

---

not he is using the method within its limits of reliability." (Guidelines, *supra,* at p. 22, italics added.)

[6] With seeming prescience, the prosecutor in this case asked Dr. Blake if he had ever known Jonakait to make presentations in a forensic criminalistics setting, and the witness answered: "I would not expect him to. Mr. Jonakait is a lawyer, not a scientist." We note that Jonakait now *has* attempted to enter the scientist's realm. An Illinois appellate court recently upheld a ruling denying a defendant the chance to call Jonakait as an expert in "the unreliability of electrophoresis." (*People* v. *Partee* (1987) 157 Ill.App.3d 231 [511 N.E.2d 1165, 1186].) The court noted that Jonakait had no "medical or scientific background" and had not received any "special training, skill or experience in testing or evaluating electrophoretic techniques." (*Id.,* at p. 1187; see Jonakait, *Will Blood Tell? Genetic Markers in Criminal Cases* (1982) 31 Emory L.J. 833.)

pretation of the proficiency test results, maintaining that the true rate of error was in fact lower. Also, like Dr. Grunbaum, he emphasized that a good analyst would be aware of potential problems through the literature and take that into account.

Dr. Blake explained that, generally, an unpreserved specimen loses enzyme activity and manifests itself through a weakening pattern and possibly some smearing. The EAP problem of one isoenzyme looking like another upon aging occurs only in stored *liquid* samples. That phenomenon has been observed and verified; an informed serologist would know of it. A "BC" reading is "always suspect on its face" because people are aware of the phenomenon.

Because water facilitates degradation (even bound water in an apparently dry sample), the ideal strategy for long term preservation is to dry and freeze the sample. A frozen dried sample can last five years or more.

Blake had some criticism for some of Dr. Grunbaum's proposed guidelines as too constraining and in some ways unrealistic. Photographing is done at FSA. The only way to guarantee accuracy is to retest, which he always recommends (sample amount permitting).

Robert Sparkes, a UCLA Center of Medicine faculty member with a postdoctoral fellowship in medical genetics and a specialty in inherited chromosomal problems, testified as an expert in medical genetics. He had used electrophoresis extensively. His experience was limited to fresh blood, but he had a "reading familiarity" with dried stain testing and had been consulted about half a dozen times in criminal cases to review law enforcement agency testing of evidence stains.

The method of electrophoresis he uses (called "electro freezing") is generally accepted by those in his field, where research in genetic mapping depends on electrophoresis. Owing to the nature of his work, "standards" and photos are not used, but samples are tested twice and independently in paternity tests. The lab hires analysts with bachelor's or master's degrees and has a six-month supervised training program.

George Sensabaugh testified as an expert in the biomedical sciences, defined in testimony as encompassing the study of infectious diseases, medical microbiology, clinical lab work and research work. He holds a Ph.D. in criminology and has used electrophoresis since the early 1960's. His experience with evidence stain analysis is limited to a "handful" of cases from 1972 to 1974. He has collaborated before with Jan Bashinski regarding sexual assault evidence, but he played no part in the analysis in this case.

Dr. Sensabaugh testified in the Michigan case, *People* v. *Young, supra,* 391 N.W.2d 270, and submitted a response to Dr. Grunbaum's amicus brief in *Brown*. The response in *Brown* was to counter what he felt were misinterpretations of the proficiency test results. By his own interpretation, those tests show an overall 2.6 percent error rate and only a 1.6 percent rate if certain labs that were "doing patently bad work" are excluded.

Outside of Dr. Grunbaum and a Dr. Diane Juricek who also testified against the reliability of electrophoresis in *Young,* Dr. Sensabaugh knows of no one, and no publications, calling the technique into question. Scientific publications are designed to educate the community about limitations of the technique; they do not compromise its basic reliability. "There really is no question among people in the field that this kind of evidence material, that is the dried stains, can be typed reliably using electrophoretic methods."

The witness described a gradual process used in the laboratory to explore, test the limits of, and ultimately reach conclusions as to dry bloodstain electrophoresis of newly discovered markers. He has personally tested the typing integrity of prepared bloodstains by subjecting them to heat and extreme light. As a general matter, typing errors inure to a criminal defendant's benefit because they are almost always errors of exclusion rather than inclusion.

Many crime labs already adhere to guidelines like those which Dr. Grunbaum proposes. Some of Grunbaum's proposals, like the strict seven-day limit, are unrealistic. Published protocols are available for each marker system. Dr. Sensabaugh was involved in unsuccessful efforts toward voluntary quality control procedures and certification. Most labs with which he is familiar have in-house training and, within the past 10 years, have hired only people with academic degrees.

Brian Wraxall, executive director of the Serological Research Institute (SRI) in Emeryville, testified as a forensic serologist. Educated in Great Britain, where he achieved a college higher national certificate, he worked at London's Metropolitan Police Forensic Science Laboratory before coming to this country and eventually founding SRI. He had given expert testimony in 75 to 100 trials, his work about evenly divided between defense and prosecution.

Called in rebuttal, Wraxall's testimony mainly concerned the possible mistyping of EAP to which Dr. Grunbaum had alluded. Like Dr. Blake, he stated that the particular phenomenon regarding the "C" allele had been noted with stored liquid samples but not with dried stains. In fact, it was a study that Wraxall coauthored which brought the pitfalls of EAP testing to

light. (Wraxall et al., *Erythrocyte Acid Phosphatase in Bloodstains* (1976) 16 J.Forensic Sci. and Soc. 127.) He testified that EAP analysis is particularly prone to error in the hands of an incompetent or inexperienced analyst and that analysts must have experience and take the published warnings into account.

Wraxall echoed Dr. Sensabaugh's explanation of the cautious process of acceptance that a newly discovered marker undergoes. He personally needs to have 25 to 50 trial runs with a new marker before he feels comfortable. He felt that electrophoretic typing methods were reliable and had been generally accepted in the scientific community.

Jan Bashinski was called as an expert in forensic serology. She had worked 21 years for the Oakland Police Department's crime lab, ever since graduating with a bachelor's degree in chemistry in 1964. Her undergraduate emphasis was biochemistry. She earned a master's degree in criminology, with a specialty in criminalistics, in 1974 at the University of California, Berkeley. Her studies included hands-on work with electrophoretic typing of bloodstains with Dr. Sensabaugh and various other course work and seminars.

Bashinski introduced electrophoretic testing and equipment to the crime lab in 1975 and became its director in 1977. She performed all the tests in this case in 1978, some with Dr. Blake's assistance at Dr. Sensabaugh's laboratory in Berkeley.

Between 1965 and the time of this retrial, Bashinski had testified 100 times as an expert in forensic serology. She had participated in two major research projects on semen evidence testing in sexual assault cases, one with Drs. Sensabaugh and Blake in 1979, and the other since 1981 with Blake. For three years, she was a member of a national committee that drafted and proposed a recommendation for certification. She was currently the executive secretary for a voluntary lab accreditation program. The Oakland lab had adhered to minimum training requirements for the last 10 years and, under her direction, became accredited in 1982. The lab's internal quality control practices included double reading, photographing, written lab notes and sometimes retesting.

Bashinski stated that electrophoresis as applied to case work is accepted in the scientific community; both fresh and dry samples can be and are reliably typed. The only contrary views of which she was aware came from Drs. Grunbaum and Juricek.

*General Acceptance*

■ The trial court concluded that the *Kelly/Frye* test of general acceptance was satisfied. It found no significant dispute in the scientific community and in fact found support for its conclusion in the testimony of Dr. Grunbaum. We agree.

Despite the technical depth of the record in this case, our function is mercifully simple. ■ "The *Frye* test does not demand the impossible—proof of an absolute unanimity of views in the scientific community before a new technique will be deemed reliable; any such unanimity would be highly unusual, . . . Rather, *the test is met if use of the technique is supported by a clear majority of the members of that community.*" (*People* v. *Guerra, supra,* 37 Cal.3d 385, 418, italics added.) "*Kelly/Frye* does not demand judicial absorption of all the relevant literature, nor does it require a decision once and for all whether a particular kind of scientific evidence is reliable. The court need only conduct a 'fair overview' of the subject, sufficient to disclose whether 'scientists significant either in number or expertise publicly oppose [a technique] as unreliable.' [Citation.]" (*Brown, supra,* 40 Cal.3d 512, 533.)

■ What is strikingly apparent from the record here and from a survey of other decisions is that Dr. Grunbaum stands virtually alone in his opposition to electrophoretic typing· of dried bloodstain evidence. Just as our courts are reluctant to accept the word of a single scientist as indicating general acceptance in the broader community, the word of a single scientist *in opposition* to a technique should be viewed with caution, particularly where the issue, as here, is an often litigated one that should, over time, have drawn out whatever public opposition exists.

Our Supreme Court took that view of Dr. Grunbaum's testimony in *Brown,* where the questioned scientific consensus was "whether for the typing categories (ABO, PGM, Peptidase-A) and body fluids (semen, blood, saliva, vaginal secretion) at issue . . . , current methodology, employed by qualified technicians, can discriminate reliably between *testable* and *untestable samples* and between *accurate* and *inaccurate results.*" (*Brown, supra,* 40 Cal.3d at p. 534.) The court, careful to confine its holding to the record before it and thus leave the door open to better proof in a future case, found the consensus lacking. (*Id.,* at pp. 534-535.) Although the record and issue in *Brown* were different from ours, the court's comments about Dr. Grunbaum are helpful. Noting his impressive credentials in the field, the court said: "Arguably his public opposition alone is 'significant [enough] in . . . expertise' to establish a legitimate scientific dispute. [Citation.] However, it is not clear that Dr. Grunbaum's views are widely shared in degree, and we are reluctant to rely on a single opinion, however respectable, to

foreclose all further evidence on the issue of scientific acceptance. [Citation.]" (*Id.,* at p. 535, fn. 5.)

Two years later, in this case, we still see Dr. Grunbaum as the lone detractor. On the other side, we have unanimous contrary agreement by scientists with a wide range of backgrounds in the scientific community. Thus, without even considering the nuances of this case, we might agree that the People have met their burden of showing consensus.

Nevertheless, the intervening decision by the Michigan Supreme Court in *People* v. *Young, supra,* 391 N.W.2d 270, calls for some substantive analysis of this record because of the similar issues and yet contrary results reached there. At issue in *Young* was electrophoretic typing performed on dried bloodstains taken from a stairway, a sidewalk and a porch. Tests run for the same five markers at issue here produced many unreadable, inconclusive or questionable results in the three-week-old samples. Three specific reliability problems were posed: (1) the possibility of false positive EAP readings caused by aging, (2) the use of a thin-gel multisystem analysis through which three markers (EsD, PGM and GLO) were tested simultaneously, and (3) the possible effects of crime scene contaminants. A bitterly divided court held three to two (with two justices not participating) that the prosecution failed to meet its *Frye* burden on the last two issues. (*Id.,* at pp. 272-273.) Of special interest to us is the fact that two of the experts here, Drs. Grunbaum and Sensabaugh, also testified in *Young,* for the defense and prosecution respectively, and the testimony of a second defense expert, geneticist Diane Juricek, supported Grunbaum on the possible effects of contaminants.

The *Young* court, relying on testimony in the case and on published studies showing that EAP tests reliably for up to 13 weeks, rejected the EAP false-positive-readings argument. (*Id.,* at p. 278; see *id.,* at pp. 291-293 [dis. opn. by Boyle, J.].) However, a three-member plurality went on to find that the thin-gel multisystem, a technique developed by Brian Wraxall to maximize the number of tests that can be run on small stains, could have compromised PGM results. The plurality cited unclear results obtained in that case and noted a lack of "independent" studies to verify the multisystem. (*Id.,* at pp. 279-281.)

On the third issue, the plurality relied on testimony by Drs. Grunbaum and Juricek that "the reliability of electrophoresis of evidentiary bloodstains would not be established in the scientific community until controlled studies were conducted taking into account the possible contaminants present at a crime scene. Juricek said '[y]ou would have to check all of these different factors . . . singularly and then in combination. . . .' The studies would

then have to be published and 'verified independently.'" (*Id.,* at p. 282.) Perceiving a lack of such comprehensive and independently verified studies, the plurality concluded that scientists do not agree on the effects of common crime scene contaminants. (*Id.,* at p. 283.) The plurality recognized that it would be impossible to test every conceivable contaminant but concluded that "the effects of certain common contaminants such as soil and gasoline could and should be tested." (*Ibid.*) The dissent felt that sufficient published studies had been done on the effects of impurities generally, so that the possibility of contamination should be handled as a preliminary question of admissibility on a case-by-case basis. (*Id.,* at pp. 293-294.) The reliability of a given sample, they urged, is distinct from reliability of the technique. (*Id.,* at p. 293.)

The reliability issue *as raised on this record* leaves us convinced that Dr. Grunbaum has shifted the focus of his attack since *Young.* His testimony in this case centers on the *need for uniform guidelines* to promote "confidence" and hence general acceptance among scientists. He admitted *at every turn*—whether the issue was aging, degradation or contamination— that competent, well trained and educated analysts who read the literature and adhere to established procedures can reliably type evidentiary bloodstains or know when to refrain from making a judgment. He testified, without qualification, that implementing minimal guidelines to that end would satisfy him.

That being his concern, there is really only one disagreement between himself and other scientists in the field. All agree that there are potential problems of degradation, spoilage and contamination that an analyst must anticipate, and all agree that the technique is reliable despite the unavoidable prospect of *some* erroneous interpretation due to analyst error. The only conflict is that Grunbaum intractably demands guidelines as quality assurance while his colleagues do not. Thus, the technique is generally, even overwhelmingly, accepted in the scientific community *without* the guidelines. As Grunbaum concedes, guidelines cannot remove the risk of error altogether. We see no reason to judicially impose a "guidelines" requirement when the *general* scientific community clearly does not.

On this record, the People have met their burden under *Kelly/Frye.*

Looking beyond the record, to the concerns of Drs. Grunbaum and Juricek as asserted in *Young,* we similarly find general acceptance. (Of course, the multisystem test was not used in this case and is not at issue.)

The question of deterioration upon aging in this case is limited. To begin with, the marker system GLO was tested on only one sample. When it

produced no typeable results, the test was not attempted on the others. The "persistence" of GLO is therefore not relevant. (Cf. *People* v.*Young, supra,* 391 N.W.2d 270, 279.)

As to the remaining marker systems (PGM, EAP, Hp and EsD), defendant has raised a question only as to EAP. The testimony suggests that there can be a false positive "C" reading if the sample deteriorates. However, the record also shows without contradiction that that particular phenomenon, a problem in stored *liquid* blood, has not been known to occur in dried bloodstains. The matter is irrelevant on the facts of this case anyway because no "C" readings were obtained. (See fn. 2, *ante.*) Moreover, the literature establishes that EAP is reliably typed up for up to 13 weeks in ambient conditions. (See *People* v. *Young, supra,* 391 N.W.2d 270, 278-279.) The samples in this case were less than a month old when they were turned over to the crime lab, where they were kept frozen until they were analyzed.

Contamination is also a fairly narrow issue on the facts of this case. We are not concerned here with the more difficult judgments required when blood is mixed with other body fluids. (See *Brown, supra,* 40 Cal.3d 512, 534, and authorities cited.) As to non-body-fluid contaminants, we believe that the uncertainty does not justify our overriding the clear consensus on this record that ongoing studies in the literature sufficiently alert an analyst to pitfalls, as they are discovered, and thus make the technique generally accepted notwithstanding continuing uncertainties. Also, the record shows that contamination usually manifests itself in ways that alert the analyst. Deferring the admissibility of this evidence until some arbitrary number or type of contaminants has been thoroughly tested, given the inevitable number and types of contaminants that would remain *un*tested, is not warranted.[7]

Defendant insists that an essential part of the People's *Kelly/Frye* "burden" was to have each witness document, with specific citation to the scientific literature, support for his or her belief that the technique is in fact reliable, and he urges that the record before us is deficient in that regard. We reject both parts of his argument.

---

[7]Some weight should be ascribed to Dr. Juricek's views in *Young,* but the opinion does not reveal much about them. She apparently lacks practical experience in testing evidence work. She voiced criticism of evidentiary testing three years ago (Juricek, *The Misapplication of Genetic Analysis in Forensic Science* (letter to the edit.) (1984) 29 J.Forensic Sci. 8) and has since been harshly criticized for basing her views on inaccuracies and unfounded assumptions (Sensabaugh, *Response to 'The Misapplication of Genetic Analysis in Forensic Science'* (letter to the edit.) (1984) 29 J.Forensic Sci. 12; Baxter, *Electrophoresis in Forensic Sciences* (letter to the edit.) (1985) 30 J.Forensic Sci. 994; see also Juricek, *Electrophoresis: A Continuation of the Discussion* (letter to the edit.) (1980) 25 J.Forensic Sci. 704). We do not think that her added voice tips the *Kelly/Frye* scale in defendant's favor.

First, defendant misstates the People's burden. A court's function under *Kelly*/Frye is "*not* to decide whether [the technique] is reliable as a matter of 'scientific fact,' but simply whether it is generally accepted as reliable by the relevant scientific community" (*Shirley, supra,* 31 Cal.3d 18, 55)—that is, whether "a consensus of scientific opinion has been achieved" (*Brown, supra,* 40 Cal.3d 512, 532) that the technique is reliable. Thus, as a matter of satisfying their initial burden, the People are not required to create a record that convinces the court that the technique is reliable. The statement in *Kelly* that "the reliability of the method must be established, usually by expert testimony" (*Kelly, supra,* 17 Cal.3d 24, 30), should be understood in that light.

On the other hand, the People *do* have to convince the court that their experts are qualified to speak for the relevant scientific community. That, we believe, was the Supreme Court's point in *Brown* when it said of two criminalists offered by the People: "[T]heir lack of formal training and background in the applicable scientific disciplines made them unqualified to state the view of the relevant community of impartial scientists. [Citation.] Moreover, *neither witness backed up his or her opinion with a discussion of the relevant scientific literature.*[Citation.]" (*Brown, supra,* 40 Cal.3d 512, 533, original italics deleted and new italics added.)

This is not to say that the court cannot question the basis for the expert witness's, or the broader scientific community's, belief in reliability. However, that is a matter of impeachment, not the People's initial burden, and the court in that situation must never take over the determination of reliability, as " 'scientific fact,' " for itself. (Cf. *Shirley, supra,* 31 Cal.3d 18, 55.) Rather, its function is to weigh any impeachment against other testimony in the case, a process that does not require the court to delve into the literature on its own for answers. In fact, a court must refrain from doing that whenever, as here, the subject matter is especially complex. (*Brown, supra,* 40 Cal.3d 512, 533-534.) Defendant thus mischaracterizes the People's "burden" under *Kelly/Frye.*

Second, defendant ignores both the ample testimony refuting Dr. Grunbaum's concerns and the abundant scientific literature that did make its way into the record below. Most of the disagreement in this case was conceptual, not technical, and was adequately explained without resort to specific scientific data. Dr. Grunbaum, in contrast to everyone else who testified, felt that existing uncertainties in the technique (acknowledged on both sides) and a lack of uniform guidelines (also acknowledged on both sides) indicate unreliability. The record is adequate to explain the dispute and justify the general scientific community's belief in reliability.

Finally, it is hard to take defendant's arguments seriously when his own expert admits that the scientific literature contains enough data to guard against unreliable results.

We hold that the People met their burden of showing that electrophoretic testing of dried bloodstain evidence is generally accepted as reliable in the relevant scientific community.

## III

The second part of the *Kelly/Frye* standard requires the People to show that the expert presenting the scientific evidence is qualified to give an opinion and that correct scientific procedures were used in the particular case. (*Kelly, supra,* 17 Cal.3d 24, 30.) The trial court held a separate hearing on these issues and concluded both that proper procedures were used and that Bashinski was qualified to testify about them.

Essentially, this part of the *Kelly/Frye* standard insures that the technique was performed reliably *in each particular case* before the evidence can be put to the trier of fact. The fact that our courts impose this case-specific burden bolsters our conclusion that potentially unresolved questions of deterioration or contamination do not invalidate the technique as a whole. Rather, if those questions are serious enough on the facts of a particular case, they can be addressed in the second phase of *Kelly/Frye* and, of course, before the trier of fact at trial should the evidence be ruled admissible.[8] The trial court in this case observed, and we agree, that competent

---

[8]Dr. Grunbaum evidently concurs in principle with the idea that reliability problems should be addressed on a case-specific basis. In a July 1981 letter to Randolph Jonakait, written in response to Jonakait's inquiries about the reliability and scientific acceptance of testing dried bloodstains, Grunbaum wrote: "[I]t is my opinion that a *qualified* forensic serologist who is aware of the problems discussed [in Zajac, *Bloodstain Phenotyping in Crime Laboratory Casework,* in Handbook, *supra,* at p. 160] is not likely to report incorrect results or interpretations of readings. These determinations are reliable and scientifically acceptable if the[y] are done correctly.

". . . In regard to your question about methodology, it is my opinion that some methods are simpler, more sensitive, and less 'error prone' than others. There are electrophoretic methods that I personally would not use for the analysis of dried blood of unknown origin because I believe they do not provide optimum conditions for resolution. However, if a competent and qualified forensic serologist chose to use these tests and if he were able to show clear and unambiguous photographs of his electrophoretograms, I would most certainly accept his findings. *I would not propose that the courts rule that any particular methodology is inadmissible. On the other hand, as an expert witness, I would feel free to challenge a forensic serologist's judgment in the selection and utilization of a particular method for a specific item of bloodstain evidence.*

". . . . . . . . . . . . . . . . . . . . . .

"In summary, it is my opinion that *forensic bloodstain analysis has progressed to the point where it should be and can be reliable and scientifically accepted. However, an individual who*

attorneys will be able to absorb enough of the relevant literature to effectively cross-examine on the subject. The record before us confirms that.

 In determining whether a technique was properly performed in a particular case, the court must examine the qualifications of the analyst *as of the time the tests were performed.* The relevant time here is February 1978. At that point, Bashinski had ample experience with electrophoresis in general. After exploring the technique in her graduate work, familiarizing herself with it on her own and then obtaining the needed equipment, she introduced electrophoresis to the Oakland crime lab in 1975. She personally performed all of the work in this case. (We have already noted that the GLO testing is not at issue.)

Bashinski was most experienced with PGM, having used it in routine case work since 1975. She did the PGM typing (and the undisputed ABO tests) in the Oakland lab, working entirely on her own. She also did screening of EAP samples (known liquid samples) on her own, but all other work was performed in Dr. Sensabaugh's lab with the assistance and supervision of Dr. Blake. Bashinski prepared most of the gels herself, but Blake assisted in matters of technique and interpreted the results.

Defendant does not dispute Blake's competence (as opposed to his impartiality—an argument we reject). The dispute is over Bashinski, who testified that she interpreted the results independently. Bashinski had somewhat limited experience with EAP. She had done many EAP runs on her own in the Oakland lab (with liquid, dry and actual evidence samples) and achieved good results. However, she had not begun reporting EAP in her case work because she felt that the lab's cooling system at the time was not "optimum" for EAP runs. Her hands-on experience with EsD and Hp was limited to experiments with stain materials in the lab although she had exposure to the tests through seminars.

---

*appears as a forensic serologist should be required to establish his experti[s]e and defend his findings and interpretations of data."* (Italics in all but the first paragraph added.)

Dr. Grunbaum made no attempt to repudiate those views when confronted with them during cross-examination in this case.

The growing range of electrophoretic methods available to the forensic scientist, a subject touched on in Grunbaum's letter but not explored much in this case, where conventional electrophoretic methods were used, could have a strong impact on case-specific *Kelly/Frye* analyses in future cases as newer methods increase the forensic scientist's ability to overcome problems of persistence, contamination and degradation. For example, by using ultrathin-layer gels in conjunction with a technique called isoelectric focusing, researchers have been able to phenotype PGM in bloodstains stored at room temperature for four months with no inconclusive or negative readings. (Budowle et al., *Subtyping Phosphoglucomutase-1 in Semen Stains and Bloodstains: A Report on the Method* (1986) 31 J.Forensic Sci. 1341, 1342-1345 [polyacrylamide gels]; see also Frank et al., *The Use of Ultrathin-Layer Agarose Gels for Phenotyping Erythrocyte Acid Phosphatase by Isoelectric Focusing* (1986) 31 J.Forensic Sci. 1089.)

Turning to the actual test results, it appears that there were no inconsistencies from one run to another on any of the samples. Ambiguous results were properly reported as inconclusive and not counted in calculating the population percentages. (See fn. 2, *ante.*) Bashinski and Dr. Blake disagreed in only one instance; Blake was willing to call an EAP test run on a swab taken from the kitchen floor (as BB), but Bashinski was not. They reported it as inconclusive. All evidence samples were frozen upon receipt by the lab and kept frozen until tested. Control runs were performed on substrates where the stains were found. Photographs were taken of all plates.

We conclude that the court acted within its discretion in finding that correct procedures were used. The evidence amply supports the ruling. Any lack of experience by Bashinski on particular markers (especially EsD and Hp) is cured by the fact that Dr. Blake, whose competence is not challenged, assisted in the tests and independently interpreted the results (including an after-the-fact review of the PGM results). Circumstantial support for the reliability of the results they reached comes from testimony that Bashinski retested four pieces of evidence from this case in March and April of *1980* (a full two years later) and got the same results. We should add that Bashinski's decision to seek Dr. Blake's help, together with her unwillingness to defer to his judgment in the EAP run and her refusal to do EAP tests without "optimum" equipment, shows her to be a conscientious and circumspect analyst.

The last issue is whether Bashinski was qualified to give expert testimony. For this we look to her qualifications at the time of the hearing, in November 1985. By then, she had implemented routine lab testing and reporting of EAP, Hp and EsD (since 1979 and 1981). She had also participated in a 1980 study on the persistence of dried and frozen stains that tested the markers PGM, EAP, EsD, ADA and AK. Her testimony showed articulate conversance with electrophoretic technique and principles.

" 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. [Citations.]" (*Kelly, supra,* 17 Cal.3d 24, 39.)

Abuse of discretion has not been shown. We note further that Dr. Blake, as well as Bashinski, ultimately testified at trial and that defendant does not challenge Blake's qualifications.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Rouse, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 17, 1988. Broussard, J., did not participate therein.