Filed 4/9/14  P. v. Taylor CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C070954 |
| v. | (Super. Ct. No. 10F04725) |
| CORNELIUS TAYLOR, | |
| Defendant and Appellant. | |

A jury convicted defendant Cornelius Taylor[1] of committing eight felony sex offenses against T.M., comprised of four counts of oral copulation with a person under 18 years of age (Pen. Code, § 288a, subd. (b)(1)),[2] and four counts of sexual penetration with a person under 18 years of age (§ 289, subd. (h)).  The trial court sentenced defendant to serve an aggregate term of seven years and eight months in state prison.

---

[1]     Defendant's name is listed here as it is in the abstract of judgment issued by the trial court.  However, as defendant stated on the stand, his name is Cornelius Taylor, *Jr.*

[2]     Undesignated statutory references are to the Penal Code.

On appeal, defendant contends (1) the trial court erred in disallowing the defense from questioning the victim about being diagnosed with a sexually transmitted infection, (2) the prosecutor committed misconduct by effectively asking jurors to put themselves into the victim's shoes in determining her credibility, (3) his due process rights were violated by the admission of testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS), and (4) the trial court abused its discretion in imposing the upper term sentence of three years for the base term, oral copulation with a minor.

We conclude the trial court properly precluded the defense from cross-examining the victim about her sexually transmitted infection because the probative value was speculative. The prosecutor did not engage in misconduct during closing argument, but properly focused her discussion of T.M.'s credibility on evidence in the record. We adhere to well-settled California law that CSAAS testimony is admissible, and conclude defendant's due process challenge attacks the evidentiary validity of CSAAS in a manner that should have been presented first in the trial court. Finally, the trial court did not abuse its discretion in finding the upper term sentence was warranted due to the victim's vulnerability and defendant's abuse of his position of trust and confidence. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

***Prosecution Evidence***

T.M. grew up in south Sacramento in an abusive and unstable household where drugs and guns were usually present. She never knew her father, and no one in the family had a job. To escape stress at home, T.M. began going to church when she was 10 years old. When she turned 14, T.M. began spending weekends at the home of defendant and his wife, J. T.M. explained that "for them to take me in and be willing to spend time

2

with me was definitely a great feeling." When T.M. was 15 years old, J. invited T.M. to live with her and defendant after hearing about T.M.'s experiences at home. T.M. and defendant developed a "father/daughter" relationship.

T.M.'s mother grew angry at T.M. one summer and refused to allow defendant and J. to enroll T.M. for her sophomore year at school. T.M. eventually got her mother to allow her to live with an aunt in Stockton and to attend school there. Nonetheless, T.M. continued to stay with defendant and J. approximately every other weekend. Defendant's son, C. and his wife T. would pick T.M. up on their way to Sacramento from Fresno and then drop her off on their way back home.

When T.M. turned 16, she moved back in with defendant and J. T.M. slept in the bedroom adjacent to the master bedroom shared by defendant and J. T.M. had a "pretty good" relationship with defendant, with whom she had gotten "really close." T.M. was more comfortable with defendant than with J. T.M.'s mother allowed T.M. to live with defendant and J. during her junior year.

One day when T.M. was 16, defendant called her into his home office. When she entered the office, defendant hugged her and kissed her on the lips. T.M. was taken aback and thought defendant had meant to kiss her on the cheek instead. She "brushed it off" and returned to the living room to watch television.

A few days later, T.M. awoke to defendant rubbing her thigh over her pajama pants. Defendant pulled down her pants, inserted two fingers into her vagina, and moved them in and out. Defendant then put his mouth and tongue on her clitoris and vaginal area. Defendant did not say anything. T.M. was shocked and pretended to be asleep. Eventually, defendant left the room.

3

T.M. and defendant acted as if nothing unusual had happened. However, T.M. felt ashamed and wondered what she had done to deserve such treatment. She did not tell anyone because she did not expect anyone to believe her, and she did not "want to be considered a home wrecker."

Approximately every other day, defendant would enter T.M.'s room as soon as J. closed the garage door to leave for work. Once inside T.M.'s room, defendant would insert his fingers into her vagina and put his mouth and tongue on her vaginal area. This happened so many times T.M. could not recall all the incidents. She tried her best to block the molestations out of her mind. She testified this conduct occurred at least four times before she turned 18.

T.M. also recalled an instance in which defendant entered her room, when J. woke up and turned on the hallway lights. Defendant met J. at the threshold of T.M.'s bedroom. J. asked what he was doing, and defendant replied he was putting money into T.M.'s drawer.

Shortly before T.M. turned 18, defendant began to have sexual intercourse with her after he digitally penetrated and orally copulated her. T.M. never said "no" to defendant. She thought: "At this point, it had been going on for so long, I felt that, if this is what he wanted, I should do this. After all, he was doing so much for me."

Neither defendant nor T.M. used birth control during sexual intercourse, which continued after she turned 18. Shortly after T.M. turned 18 and graduated from high school, she discovered she was pregnant. Having blocked the instances of sexual intercourse with defendant from her mind, she did not think she could have been pregnant. Discussing her missed periods with T., T.M. initially thought she was just suffering from stress. However, after she took a pregnancy test, she decided to terminate

4

the pregnancy in order to join the Air Force. J. and T. pressed T.M. to reveal the father, but T.M. remained silent in an effort to protect defendant. Finally, to deflect further questions, T.M. made up a story about having sex with a boy at a party. J. told T.M. that as soon as she had the abortion she would have to move out of the house.

T.M. had an abortion while living with C. and T. for a week or two. Sometime thereafter, defendant convinced T.M. to move back in with him and J. and "do the right thing, and go by [J.'s] rules." Once T.M. returned, defendant resumed his frequent acts of digitally penetrating her and performing oral sex on her. However, sexual intercourse happened "only a couple of times."

In January 2004, T.M. joined the Air Force. Twice when T.M. stayed at defendant's house while on leave, defendant digitally penetrated and orally copulated her. During the last instance, T.M. was 21 and had hoped staying away for several years would mean defendant would stop sexually abusing her. Afterward, T.M. vowed never to return to defendant's house. Nonetheless, T.M. maintained communications with defendant because she considered him a father figure.

When T.M. was 19 and in the Air Force, she became pregnant by someone other than defendant. She called defendant for advice on whether to get an abortion.

T.M. got married in 2008, approximately two years after meeting her husband. She decided to confront defendant about her sexual abuse after she had trouble sleeping and when the memories affected her marital relationship. Stationed in Hawaii at the time, T.M. called defendant and "told him [she] was disgusted with him" and herself. Defendant responded, "I'm sorry," and told T.M. when she had children she should "watch out for people like this." Defendant said T.M.'s husband could call and talk to him. T.M. felt relieved defendant was willing to help. A few minutes after the

5

conversation ended, defendant called back and left a voice message T.M. saved. In that message, which was played for the jury, defendant stated: "I just called to let you know I am so sorry that I hurt you and I would do anything in the world to –- to make that up to you. I do humbly apologize again, anything wrong that I've done to you. I ask -– I don't care if you don't ever forgive me that's -– that's fine. But if there's anything I can do to (unintelligible) help, please don't hesitate to call. And again, I'm very sorry for what I did. Bye."

T.M.'s difficulties in sleeping and with her husband worsened over the ensuing months. In January 2009, she had an emotional breakdown at work. T.M. told her supervisor about defendant's sexual abuse. T.M. also called J. and told her about the molestations. T.M. then reported the abuse to the Air Force Office of Special Investigations. The Air Force turned the investigation over to the Sacramento Police Department.

In 2010, T.M. traveled from her post in Hawaii to Sacramento to meet with a police detective. While meeting with the detective, T.M. participated in a pretext call to defendant. The call was recorded and played for the jury. During the call, T.M. stated defendant's sexual abuse still caused her pain. She also told him of the ridicule she suffered when he got her pregnant at age 16. Defendant did not deny the accusations and repeatedly apologized. At one point T.M. said, "[D]o you understand I was 16 when you came into my room to start touching me and like for real. I don't think you want to deal with this. This is the reality of the situation. You stole my virginity, a grown man with a 16 year-old, for real?" To this, defendant replied: "Right – right."

T.M. inquired, "Was there anything that I did?" Defendant responded, "That is -– that is the sickest thing -– there's some underlying motive here and -– and I -– and I can't

6

figure it out and, um, I'm –- I've –- I've –- tried –- tried –- tried –- tried. I've cried tears and tried to figure out what . . . motivated –- there -– there's nothing I can give you. I can't –- you can't -– whatever you said I did, I cannot take that back." As the discussion continued, defendant told T.M.: "Now this is what I want you to do, don't ever tell anybody. Don't you ever tell anybody, and I'm begging you."

*CSAAS Testimony*

The prosecution called Anthony Urquiza, Ph.D., a licensed psychologist to testify as an expert on CSAAS. Dr. Urquiza explained CSAAS was first described in a scholarly article written in 1983 to dispel misperceptions about childhood sexual abuse. Dr. Urquiza noted he was not rendering an opinion about whether a particular child was molested or whether a particular individual perpetrated an act of child molestation.

Dr. Urquiza stated CSAAS describes five categories of behaviors commonly engaged in by victims of child sexual abuse: secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction. CSAAS is not a diagnostic tool and does not predict that every victim of child sexual abuse will exhibit all five categories of reactions. However, "[g]enerally, there is some type of misperception or myth that accompanies each of those five parts of accommodation syndrome."

Dr. Urquiza opined that CSAAS descriptions applied even to a victim who was first sexually molested at age 16. Dr. Urquiza also recounted research showing the closer the relationship between the perpetrator and the victim, the longer the likely delay between the abuse and the victim's initial disclosure.

## *Defense Evidence*

Defendant's son testified he and his wife slept next to T.M.'s bedroom for several months in 2002 and 2003. He never heard any usual sounds from the bedroom in which T.M. was sleeping. T.M. never appeared to be nervous around defendant or J. Defendant's son and his wife allowed T.M. to live at their house for two weeks when she was pregnant, but kicked her out when she refused to name the father or do anything other than watch television.

T. also testified she heard nothing unusual from T.M.'s bedroom during the months she and defendant's son slept in the adjacent bedroom at defendant's house. According to T., T.M. never named the person who made her pregnant. She only said it "happened at a graduation party."

J. testified she and defendant allowed T.M. to move in when T.M. expressed an interest in living with them. J. liked T.M. but frowned on her "slothful and lazy" behavior. J. confronted T.M. when she first appeared to be pregnant. When the home pregnancy test turned out positive, J. asked T.M. how she planned to proceed. When T.M. refused to reveal the father, J. kicked T.M. out of the house. Eventually, J. relented and allowed T.M. to move back in.

J. once saw defendant at the door to T.M.'s bedroom and they had a conversation. However, J. did not follow up by going inside and turning on the lights in T.M.'s bedroom. In January 2009, T.M. made "vague" accusations about defendant, but J. "just blew her off."

Defendant testified on his own behalf. Defendant explained he has been a certified pastor since 1987. He and J. allowed T.M. to move in with them, and he treated her like a daughter. When T.M. became pregnant in high school, the family held a

8

meeting during which they pressed her to reveal the father. When she refused, defendant "picked her up" from the floor and "smacked her," saying: "You're going to be trifling like your mother." Defendant immediately let her go and knew he had been wrong to hit her. Defendant told T.M. she did not need an abortion, and that he and J. would raise the baby.

Defendant denied T.M. told him about her second pregnancy as she had testified. However, he stated T.M. called him in September 2008 to accuse him of spreading gossip about her pregnancy and abortion shortly after high school. During that call T.M. had not accused him of molesting her. Defendant first learned of the accusations of molestation in January 2009 –- after T.M. talked with J. Defendant told J. the accusations were "a lie."

On cross-examination, defendant denied ever having sexual contact with T.M. Regarding the call from T.M. in September 2008, defendant denied telling her to keep her children away from people like him. Instead, defendant had warned her to keep any children she might have away from pedophiles. As to both the voicemail message defendant left for T.M. and the pretext call, defendant explained his apologies all related to his slapping of T.M. after she first became pregnant. Defendant acknowledged he had not mentioned slapping during the recorded apology or pretext telephone call.

### *Rebuttal Evidence*

On rebuttal, T.M. testified that defendant never hit her.

9

DISCUSSION

**I**

***Exclusion of Evidence Regarding the Victim's Sexually Transmitted Infection***

Defendant contends the trial court denied him a fair trial by excluding "[e]vidence that T.M. had been diagnosed with [human papilloma virus (HPV)] and that [defendant] never had been diagnosed with a sexually transmitted disease." We reject the contention.

**A.**

***Motion to Introduce Evidence of the Victim's HPV Infection***

The defense sought to disprove that defendant had sexual contact with T.M. by introducing evidence she had been diagnosed with HPV and defendant had not. To this end, the defense filed a pretrial motion for a hearing pursuant to Evidence Code section 782 to determine the admissibility of an April 2009 memo in T.M.'s Air Force record. In pertinent part, the memo stated: "[HPV] has been detected as part of a routine pap test. This is a common (the most common) sexually transmitted disease." Although the memo mentioned that, in January 2009, T.M. had "one visit for mental health related concerns from an alleged past sexual abuse," it did not indicate when she was first diagnosed with HPV. Although the defense asserted defendant had never been diagnosed with HPV, it made no assertion defendant had ever been tested for such infection.

The People opposed the motion, pointing out the Centers for Disease Control and Prevention reports most people who are infected with HPV have no observable symptoms and do not know they are infected. The People also noted the molestations occurred between January 2002 and May 2003 -– more than five years before the pertinent memo was issued by the Air Force. Indeed, it was possible T.M.'s husband had transmitted the infection.

The trial court denied the motion, finding that "given the totality of evidence supplied by the defense in its offer of proof, the Court finds that the offer of proof remains insufficient to require a hearing under [Evidence Code] section 782(a)(3). The argued basis for relevancy is too attenuated and does not constitute a sufficient basis to move forward with a hearing."

## B.

### *Admissibility of Evidence Concerning a Victim's Sexual Conduct or History*

As the California Supreme Court has explained, "Evidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions." (*People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*).) To this end, Evidence Code section 782 allows the admission of evidence concerning a victim's sexual conduct only when "(1) the defendant submits a written motion 'stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness' (*id*., § 782, subd. (a)(1)); (2) the motion is accompanied by an affidavit, filed under seal, that contains the offer of proof (*id*., subd. (a)(2)); (3) '[i]f the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant' (*id*., subd. (a)(3)); and (4) if the court, following the hearing, finds that the evidence is relevant under Evidence Code section 780 and is not inadmissible under section 352, then it may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted. (*Id*., § 782, subd. (a)(4).)" (*Fontana,* at p. 362.)

11

As the *Fontana* court noted, "The Legislature's purpose in crafting these limitations is manifest and represents a valid determination that victims of sex-related offenses deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy. (*People v. Rioz* (1984) 161 Cal.App.3d 905, 916–917; accord, *Michigan v. Lucas* (1991) 500 U.S. 145, 149–150.) By affording victims protection in most instances, these provisions also encourage victims of sex-related offenses to participate in legal proceedings against alleged offenders. (Letwin, '*Unchaste Character': Ideology, and the California Rape Evidence Laws* (1980) 54 So. Cal. L.Rev. 35, 40 (Letwin); accord, Advisory Com. Note to Fed. Rules Evid., rule 412, 28 U.S.C.) Accordingly, our courts have properly exercised the discretion afforded by Evidence Code section 782 'narrowly' (*People v. Chandler* (1997) 56 Cal.App.4th 703, 708), and we emphasize that '[g]reat care must be taken to insure that this exception to the general rule barring evidence of a complaining witness' prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a "back door" for admitting otherwise inadmissible evidence.' (*People v. Rioz, supra*, 161 Cal.App.3d at pp. 918–919.)" (*Fontana*, *supra*, 49 Cal.4th at pp. 362-363.)

Moreover, under the Evidence Code, "[n]o evidence is admissible except relevant evidence." (Evid. Code, § 350.) As the California Supreme Court has noted, " 'speculation is not evidence.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 735, quoting *People v. Berryman* (1993) 6 Cal.4th 1048, 1081.) Thus, " 'exclusion of evidence that produces only speculative inferences is not an abuse of discretion.' " (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320, quoting *People v. Cornwell* (2005) 37 Cal.4th 50, 81.)

## C.

### *The Evidence Sought to be Admitted Was Speculative*

The defense sought to use evidence of T.M.'s HPV infection in a manner that was speculative and therefore not relevant or admissible. Defendant's assertion he had never been diagnosed with HPV did not mean he was free from infection. Defendant could have transmitted the HPV infection to T.M. by his sexual abuse and still believed he was free of the virus because he never developed symptoms. As the People's motion notes, most persons infected with HPV remain unaware of their infection or that they are transmitting the virus to their sexual partners. Even if defendant had shown himself to be free from HPV infection, it is possible T.M. contracted the infection from her husband or some other source during the more than five years after the last molestation and the date of the Air Force memo. Consequently, the defense sought to introduce the fact of T.M.'s infection to invite the speculation defendant's seeming lack of infection meant he had no sexual contact with her at any time. However, as the California Supreme Court has held, "evidence leading only to speculative inferences is irrelevant." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.)

Defendant acknowledges the Air Force memo does not indicate when T.M. was first diagnosed with the HPV infection. However, he suggests T.M. could easily have been asked about when she was first diagnosed with the virus. We reject the suggestion. Under Evidence Code section 782, the sexual conduct and history of a victim are not fodder for this type of exercise in speculation. As this court has previously noted, "The purpose of an Evidence Code section 782 hearing is to establish the truth and probative value of the offer of proof, not to allow a fishing expedition based on sketchy and unconfirmed allegations." (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1518.) Even

13

aside from the possibility of defendant's own latent infection, speculation as to the timing of T.M.'s diagnosis does not render the fact of her infection nonspeculative for purposes of disproving sexual abuse by defendant. The trial court correctly precluded the defense from introducing evidence of T.M.'s infection in hopes of having the jury speculate defendant's lack of apparent infection meant he also lacked guilt as to the charged sex offenses.

## II

### *Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in misconduct by effectively inviting jurors to put themselves into the victim's shoes in determining her credibility. The Attorney General counters that defendant forfeited the claim by failing to make a timely objection to the alleged prosecutorial misconduct on the grounds defendant now advances on appeal. The Attorney General also notes defense counsel did not ask the trial court to admonish the jury. We conclude the issue has been preserved for review, but defendant's argument is not persuasive.

### A.

### *The Prosecutor's Closing Argument*

As the California Supreme Court has explained, " 'a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 298.) Under the federal constitution, prosecutorial misconduct results if "the challenged action ' "so infected the trial with unfairness as to

14

make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181, 91 L.Ed.2d 144.)" (*People v. Riggs*, at p. 298.)  However, " ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion —- and on the same ground -— the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.  [Citation.]" ' " (*Ibid.* at p. 298, quoting *People v. Stanley* (2006) 39 Cal.4th 913, 952.)

Here, the prosecutor argued T.M. was a credible witness whose testimony was confirmed by defendant's failure to deny her allegations of sexual abuse during the pretext call.  The prosecutor then rhetorically asked, "why would [T.M.] do this if it didn't happen."  To illustrate her point, the prosecutor related a story told by her colleague about attending a prosecutor's conference that addressed the topic of sexual assault victim testimony.  As the conference was about to recess, the instructor announced that after lunch attendees would describe the details of their last sexual experience to the class.  At this point in the closing argument, the defense objected as follows:

"[Defense counsel]:  Your Honor, I'm going to object on the basis of relevancy. This is not proper argument.

"THE COURT:  Overruled.  Go ahead."

The prosecutor continued with the story and noted that attendees suddenly realized how embarrassing it can be to talk about sexual experiences in front of an audience.  The prosecutor continued:

"So why would [T.M.] go through this if it were not true.

"Why would she tell her husband this is what happened to me with the guy I called my dad. Why would she call and confront the defendant's wife after so many years had passed, and tell her that.

"Why would she break down in tears at work in Hawaii and tell it to her supervisor. Why would she then let herself be interviewed by a special agent with the Air Force, and sign a statement on an Air Force document affirming that it's true and correct that that happened.

"Why would she travel to Sacramento to meet with an SPD detective to do a phone call, and say all . . . those things on the phone call if it wasn't true.

"Why would she fly from Ohio to testify here to talk about this embarrassing thing in front of you, people she has never met, this thing that for so many years she felt was her fault, and was between her and God, and be subject to cross-examination by a trained and experienced defense attorney, if that hadn't happened.

"For what. Has there been any explanation from any of the defense witnesses. The people who knew her well. Has anyone come in and said she is crazy, she is trying to extort something.

"Nothing. Nothing, whatsoever. For a slap. For putting business out on the street. Use your common sense, and you will know that that does not make sense."

As the Attorney General notes, the defense objected to the prosecutor's argument on grounds of relevance. However, defense counsel further stated: "This is not proper argument." This latter part of defense counsel's objection might relate to the relevance objection, or it might relate to defendant's current argument that "[i]t is improper for the prosecutor to appeal to the passion and prejudice of the jury in closing argument." Based on the ambiguity, we give defendant the benefit of the doubt as to the exact nature of

16

defense counsel's objection and consider the issue on the merits. (*People v. Young* (2005) 34 Cal.4th 1149, 1225.) We also decline to declare a forfeiture for failure to request that the jury be admonished because the defense objection was immediately overruled by the trial court, which then directed the prosecutor to continue with her argument. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 692.)

## B.

### *The People's Argument Was Proper*

The prosecutor did not engage in misconduct during closing argument. Contrary to defendant's assertion, the prosecutor did not invite the jury to "put themselves into [T.M.]'s shoes." Instead, the prosecutor used the story of a colleague to illustrate the embarrassment inherent in talking about sexual experiences in front of an audience. This story was not inflammatory.

Rather than inviting jurors to imagine themselves in T.M.'s place, the prosecutor asked rhetorical questions about T.M.'s motive to testify that were based on the evidence in the record. Thus, the prosecutor pointed out T.M. had voluntarily engaged in difficult and embarrassing discussions with her husband, her supervisor, and members of the law enforcement community that she could have avoided by remaining silent. And, the prosecution noted T.M. had no motive to make up lies about defendant's sexual abuse. In so arguing, the prosecutor urged the jury to conclude spreading rumors about T.M. or a single slap did not seem sufficient to motivate T.M. to report the sexual abuse, reveal such intimate and embarrassing details during the investigation, and testify at trial. A prosecutor does not engage in improper argument by relying on facts in the record to urge the jury to find a particular witness credible. (*People v. Medina* (1995) 11 Cal.4th 694, 757.)

In *People v. Farnam* (2002) 28 Cal.4th 107, the California Supreme Court rejected an assertion of improper closing argument by the prosecution because, "[r]ead in context, the challenged comments urged the jury to credit the witnesses' testimony based on matters within the record." (*Id.* at p. 170.) Here too, the prosecutor relied on the evidence to suggest T.M. was a credible witness. In short, we conclude the prosecutor's discussion of T.M.'s credibility was proper.

## III

### *Admissibility of Evidence Regarding CSAAS*

Defendant contends the admission of Dr. Urquiza's testimony about CSAAS violated his federal constitutional right to due process. We disagree.

### A.

### *Scope of Review*

The defense moved to exclude CSAAS testimony on grounds it violated Evidence Code section 352, was not relevant, and was not based on "scientific support." Defendant did not urge exclusion of the evidence on federal due process grounds but only on state law grounds. Ordinarily, an objection based on state law does not preserve a claim based on the United States Constitution. (*People v. Lewis* (2006) 39 Cal.4th 970, 1028 & fn. 19.) A defendant's objection must apprise the trial court of the pertinent evidentiary analysis it should undertake to determine admissibility. Nonetheless, we conclude that "defendant may make a very narrow due process argument on appeal. He [or she] may argue that the asserted error in admitting the evidence over his [or her] Evidence Code section 352 objection had the additional legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

18

However, defendant may not argue on appeal that CSAAS constitutes "junk science" based on his discussion of articles and treatises published in the psychology field.  Defendant seeks to prove facts on appeal by making arguments that fall within the fact-finding expertise of the trial court.  Defendant's arguments about "junk science" should first have been addressed in the trial court before raising them on appeal.  (*People v. Reilly* (1987) 196 Cal.App.3d 1127, 1135, quoting *People v. Brown* (1985) 40 Cal.3d 512, 533.)  Consequently, we limit our review to defendant's due process argument insofar as it focuses on the trial court's refusal to exclude CSAAS evidence under Evidence Code section 352 rendered the trial unfair within the meaning of the federal due process clause.

## B.

### *Due Process*

CSAAS evidence has repeatedly and uniformly been held to be admissible in California for the limited purpose of dispelling misconceptions lay jurors may have about of how childhood victims of sexual abuse typically react.  (See, e.g., *People v. Brown* (2004) 33 Cal.4th 892, 905-907; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Housley* (1992) 6 Cal.App.4th 947, 955; *People v. Archer* (1989) 215 Cal.App.3d 197, 205, fn. 2; *People v. Bowker* (1988) 203 Cal.App.3d 385, 392-394.)  This court noted, in *In re S.C.* (2006) 138 Cal.App.4th 396, that "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse."  (*Id.* at p. 418 [collecting authority].)

Defendant urges us to hold CSAAS evidence is inadmissible based on the out-of-state decisions of *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, *State v. Bolin* (Tenn. 1996) 922 S.W.2d 870, *Bussey v. Com.* (Ky. 1985) 697 S.W.2d 139, *Lantrip v. Com.* (Ky. 1986) 713 S.W.2d 816, and *Sanderson v. Com.* (Ky. 2009) 291 S.W.3d 610. Defendant's argument, however, fails to acknowledge other out-of-state jurisdictions have held CSAAS-type evidence to be admissible. (E.g., *State v. Batangan* (Hawaii 1990) 799 P.2d 48, 51-52; *Matter of Nicole V.* (N.Y. 1987) 71 N.Y.2d 112, 120-121; *State v. Lindsey* (Ariz. 1986) 720 P.2d 73, 74-75; *Allison v. State* (Ga. App. 1986) 179 Ga. App. 303, 308; *State v. Brotherton* (Iowa 1986) 384 N.W.2d 375, 378; *State v. Pettit* (Or. App. 1984) 675 P.2d 183, 185; *State v. Myers* (Minn. 1984) 359 N.W.2d 604, 609-610; *Smith v. State* (Nev. 1984) 100 Nev. 570, 572.) When appellate counsel advance arguments based on extra-jurisdictional surveys of reported decisions, it behooves them to disclose both favorable *and* unfavorable decisions. (Rules Prof. Conduct, rule 5-200(B) [counsel obligated to avoid misleading the court regarding the facts or law].)

More importantly, as defendant acknowledges, a similar due process challenge to CSAAS testimony was rejected in *People v. Patino* (1994) 26 Cal.App.4th 1737. The *Patino* court rejected a claim that defendant's "right to due process was violated by the introduction of CSAAS testimony. The United States Supreme Court has held the admission of relevant evidence of the battered child syndrome does not violate the due process clause of the Fourteenth Amendment. (*Estelle v. McGuire* (1991) 502 U.S. 62, [68-70].) Battered child syndrome evidence is analogous to CSAAS evidence. (*People v. Bowker, supra*, 203 Cal.App.3d at pp. 393–394.) For this reason, there can be little doubt the due process dimensions of both types of evidence is similar if not

identical.  Therefore, introduction of CSAAS testimony does not by itself deny appellant due process." (*Patino*, at p. 1747.)  We agree.

Moreover, as the *Patino* court concluded, "the essence of a due process violation is a denial of a criminal defendant's right to a fair trial.  (See *People v. Bell* (1989) 49 Cal.3d 502, 534.)" (*Patino, supra,* 26 Cal.App.4th at p. 1747.)  Thus, *Patino* rejected the due process challenge because the defendant in that case "failed to demonstrate how his fundamental right to a fair trial was violated by the introduction of CSAAS testimony to rehabilitate [the victim's] testimony after a rigorous defense cross-examination calling into question the victim's credibility." (*Id.* at p. 1747.)  The same result is compelled here, where defense counsel cross-examined both T.M. and Dr. Urquiza at length.  The defense also vigorously argued the evidence suggested T.M.'s testimony was untrustworthy.  Accordingly, we reject defendant's argument that the admission of CSAAS evidence requires reversal.

## IV

### *Imposition of the Upper Term Sentence*

Defendant contends the trial court erred in imposing the upper term sentence for the base term because the record does not support the findings T.M. was particularly vulnerable and defendant took advantage of his position of trust and confidence.  We reject the contention.

"A trial court has broad discretion in making sentencing choices.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  Nevertheless, a trial court is required to state its reasons for any sentencing choice (e.g., imposition of an upper term) on the record at the time of sentencing.  (§ 1170, subd. (c)); *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1769.)  One aggravating factor is sufficient to support the imposition of an upper term.

(*People v. Davis* (1995) 10 Cal.4th 463, 552; *People v. Castellano* (1983) 140 Cal.App.3d 608, 614–615.)" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1371.)

Here, the People filed a sentencing brief that argued the upper term was appropriate due to T.M.'s vulnerability, the crimes were carried out with planning, and defendant abused his position of trust. The defense also filed a sentencing brief to argue for a grant of probation, or, alternatively, to impose the lower term. In so arguing, defendant disputed T.M. had been particularly vulnerable or that she actually placed her trust in defendant.

The trial court selected the upper term of three years, explaining: "The Court has selected this term in considering all of the circumstances in this case, considering the aggravating circumstances in this case substantially outweighing the mitigating circumstances presented. The Court has also considered that the victim in this matter was particularly vulnerable at the time these crimes were committed and that the defendant took advantage of a position of trust and of confidence to commit these crimes."

The two findings used to impose the upper term centered on defendant's betrayal of a position of trust and moral authority he claimed as pastor and T.M.'s father figure. To occupy a position of trust, it is not necessary to be a parent, teacher, police officer, or religious figure. Instead, the defendant need only be "a person in whom [the victim] reposed trust and confidence." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 338.) Here, defendant did claim a special authority –- both as a father figure and as a pastor –- and his abuse of the trust T.M. placed in him caused her long-lasting harm. As T.M. testified, she delayed reporting the sexual molestations because she was sure no one would take her word over that of defendant. Defendant's authority over T.M. was so extraordinary she did not reveal defendant was the father of her unborn child –- even

22

though she was kicked out of the house for keeping silent.  Moreover, defendant's abuse of trust caused T.M. to suffer sleeplessness, emotional distress, and marital difficulties even years after the abuse ended.

The record amply demonstrates defendant's repeated molestations of T.M. while in a position of trust caused her deep emotional and psychological scars far beyond the physical conduct described by the offenses for which defendant was convicted.  The trial court did not err in selecting the upper term for the base term.[3]

DISPOSITION

The judgment is affirmed.

      HOCH    , J.

We concur:

     RAYE    , P. J.

     HULL    , J.

---

[3]    Our conclusion that the record supports the trial court's sentencing decision as to the base term obviates the need to consider defendant's contention he received ineffective assistance of counsel in the event this issue had not been preserved for appeal.

23