Filed 6/28/24  P. v. Mosqueda CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JOSE MOSQUEDA,<br><br>Defendant and Appellant. | C098152<br><br>(Super. Ct. No. 19FE017054)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Appellant filed a petition for rehearing with this court.  It is hereby ordered that the petition for rehearing is denied.

1

It is also ordered that the opinion filed herein on June 20, 2024, be modified as follows:

1.    On page 9, following the sentence in the last paragraph that reads -- Garbutt agreed, however, that cell tower connection data provided only a general coverage area, potentially as wide as "a mile, two miles, maybe three miles." -- a footnote is to be inserted as follows:

"[7] In a petition for rehearing, defendant states his intent to establish in a future proceeding that Trax technology was properly challengeable and that its use subjected him to prejudice. To that end, he requests that this opinion "reflect the proximity of [defendant's] house to [Mayra's house]." Although defendant requests that we note the "driving distance" between the two houses, his calculated distance does not appear in the record. Accordingly, we note Garbutt's testimony, acknowledged by the Attorney General in his respondent's brief, that defendant's and Mayra's residences were within the same cell tower coverage area."

2.    The remaining footnotes should be renumbered due to the addition of a new footnote 7.

This modification does not change the judgment.

FOR THE COURT:

_____/s/_____
Earl, P. J.

_____/s/_____
Duarte, J.

_____/s/_____
Krause, J.

Filed 6/20/24  P. v. Mosqueda CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098152 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE017054) |
| v. | |
| ANTHONY JOSE MOSQUEDA, | |
| Defendant and Appellant. | |

Defendant Anthony Jose Mosqueda was involved in two residential break-ins, and a jury found him guilty of two counts of first degree burglary, attempted first degree robbery, and unlawful possession of a firearm. As to one burglary count, the jury found that a person other than an accomplice was in the residence during the burglary. As to the other burglary count, the jury found that one of the principals was armed during the commission of the offense. Defendant was sentenced to 27 years in prison.

On appeal, defendant contends: (1) trial counsel was constitutionally ineffective for failing to object to evidence regarding cell phone location data that was based on

1

scientific techniques not generally accepted by the relevant scientific community under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*); (2) insufficient evidence supports his conviction for unlawful possession of a firearm because the conviction was based on indistinct video from a surveillance camera; (3) trial counsel was constitutionally ineffective for failing to object to photographic evidence of him holding handguns weeks before the burglaries; (4) insufficient evidence supported his attempted robbery conviction because the evidence did not demonstrate that he possessed the requisite intent to be convicted of the crime; (5) his conviction for unlawful firearm possession must be stayed under Penal Code section 654 because that conduct was indivisible from the burglary.[1]

We agree with defendant that insufficient evidence supports his attempted robbery conviction, and therefore we reverse that count of conviction and remand for a full resentencing. We disagree with defendant's remaining contentions and otherwise affirm the judgment.

## FACTS AND PROCEEDINGS

*Burglary of Mayra's House and Attempted Robbery*

Mayra lived in a one-story house in Sacramento with her mother and her friend Anna. They each had separate bedrooms. At around 3:00 a.m. on February 24, 2019, Mayra heard glass breaking. Her mother began screaming immediately after the sound of the glass breaking. Mayra sent Anna a text message asking if Anna had heard the noise; Anna replied that she thought someone had broken into the house. Mayra then heard footsteps down the hall and a man's voice say, "If anybody moves I'll kill you." She called 911; the call was played for the jury. On the 911 call, Mayra said the man "has my mom (unintelligible)." She also said, "I hear (unintelligible) trying to open that door."

---

[1] Further undesignated statutory references are to the Penal Code.

2

But while Mayra heard footsteps coming up and down the hallway, she did not see a person in the house.[2]  Other than the sound of footsteps coming up and down the hallway, Mayra did not hear the perpetrators make any other sounds.  None of the house's residents left their bedrooms until law enforcement arrived and said it was safe to do so.

A side gate had been opened and led to a previously locked door with glass windows that had been shattered.  There was a crack in the door to Mayra's mother's room.  Photographs taken of the house after the break-in showed two cars parked in a driveway in front of the house.  Nothing was stolen from the house.

*Text Messages and Cell Phone Location Evidence Related to Mayra Break-In*

Detective James Hart of the Sacramento County Sheriff's Office identified Jose Smith, Stephen Gee, Timothy Garone, and defendant (combined, defendants) as potentially involved in the burglary.  Hart obtained and downloaded the contents of cell phones possessed by defendant, Smith, and Gee.  Hart also subpoenaed cell phone records for each of those individuals, as well as for Garone, and he obtained cell phone location data provided by Google for defendant and Smith.  Hart provided those records to Daniel Garbutt, an investigator with the Sacramento County District Attorney's Office.

Garbutt used Trax, a program created by a company known as ZetX, to track the presumed location of the cell phones belonging to the defendants at the times relevant to the burglary.[3]  In addition to location data, multiple text messages and photographs from the defendants' phones were presented as evidence at trial.[4]

---

[2]  In closing, the prosecutor acknowledged that there was no evidence as to the identity of the person who threatened the house's residents.

[3]  This evidence is the subject of defendant's ineffective assistance of counsel claim.  We discuss Trax in greater detail and address defendant's claim in the Discussion, *post*.

[4]  On appeal, defendant assumes that he was properly convicted of the burglary of Mayra's house but claims that insufficient evidence supported his conviction for

3

Before the break-in, the defendants generally communicated about a plan to commit a burglary. At around 1:43 a.m.--more than an hour before the break-in--location data indicated that Smith's phone was in a car that was driving near Mayra's house.

At 1:54 a.m., Gee texted Garone, "Hopefully, he left all of his jewelry." Garone responded that "they went to snowboard." Gee replied, "O's been there for a while. No movement, no nothing."[5] Two minutes later, Garone texted Gee, "That's how it was the other day when I was there," and Gee responded, "Got to be gone. Someone is ballin' that hard, you would see movement. We both know that." At approximately 2:00 a.m., Garone's phone moved toward Mayra's residence.

At trial, Hart testified that he believed the defendants entered Mayra's house by mistake. He observed that Mayra's house was on a street with "about a dozen duplexes all on [Mayra's] side of the street, and they're pretty much cookie-cutter." He added that the street was dark because there were no streetlights. Accordingly, "it would be very easy to mistake one house for another, especially if you weren't super-familiar with that house."

At 2:29 a.m., defendant's phone was close to Mayra's house, and calls between Smith, Garone, and Gee's phones all placed the phones within the cell tower coverage area that included Mayra's house. At 2:58 a.m., Smith's phone connected to a Wi-Fi network in the immediate vicinity of Mayra's house. Between 2:59 a.m. and 3:01 a.m., defendant's phone connected to a Wi-Fi network that put him within 42 meters of Mayra's house.

---

attempted robbery as an aider and abettor because there was no evidence that the defendants knew the house was occupied when they entered it. Because defendant does not challenge his burglary conviction, we focus on any evidence supporting the attempted robbery conviction.

[5] The defendants referred to Smith as "Oso" or "O."

Between 3:03 and 3:06 a.m., defendant's phone was moving away from Mayra's house. At 3:15 a.m., the evidence was consistent with defendant's phone being located at his residence. At 3:23 a.m., Gee's and Garone's phones were in their respective residences' coverage areas.

At 3:17 a.m., Gee texted an unknown number that "nothing went good." Three minutes later, Smith texted Gee a photo (Detective Hart was unable to retrieve the photo) followed by text stating, "No. Wrong one." Minutes later, Smith texted his girlfriend, "We're done, babe. On our way home." At 3:30 a.m., Smith's phone was at or near defendant's apartment. At 3:38 a.m., Garone texted Smith, "We on scanners," which Hart understood to be a reference to police scanners. A few hours later, at 8:34 a.m., defendant used his phone to view a list of people who were wanted on a website called Crime Alert.

*Katrina Burglary*

On February 26, 2019, Katrina lived with her three children and boyfriend in a house in Antelope, California. Surveillance cameras were installed on the inside and outside of the house. While Katrina was at work, she received a phone alert from her home's security system that someone was in her house. Using her phone, Katrina saw a man inside the house on the indoor camera's video feed. When she returned home, she saw that the master bedroom upstairs "was pretty much upside down." Stolen items included shoes, clothes, and purses.

Katrina posted photographs from the surveillance video on Facebook. When contacted by the media for an interview, she provided surveillance video clips. A compilation of the clips was played for the jury. It showed a red four-door sedan pull up to a curb, and a man in a hooded sweatshirt with a prominent Jordan brand logo get out of the front passenger door. The video then switched to the indoor surveillance camera. It showed a man wearing a similar hooded sweatshirt open the front door of the house and lower his hood. The man took out what appeared to be a handgun from his right pants

5

pocket. He then moved the gun toward the middle of his body and held the barrel with his left hand, appearing to rack the slide. He turned his back away from the camera towards a small barking dog entering the frame, and appeared to aim the gun briefly at the dog. The video then switched back to the outdoor camera. The man in the hooded sweatshirt walked back to the red sedan carrying a full white trash bag, opened the rear passenger-side door, and put the bag in the back seat area. He opened the front passenger door and got into the car.

Detective Hart learned about the burglary on Facebook. After receiving a tip that defendant could have been involved in the burglary, Hart compared photos of defendant to the suspect in the surveillance video and believed there was a "good resemblance" based on defendant's tattoos and physical build. Hart identified Smith as also potentially involved in the burglary. Relying on the surveillance video, Hart testified that the person in the video possessed a handgun.

*Cell Phone Evidence Related to Katrina Burglary*

On February 26, defendant's cell phone received a call from Smith at 12:12 p.m., which lasted more than nine minutes. At that time, defendant's phone was connected to a cell tower within the coverage area of Katrina's house. At 12:16 p.m., Wi-Fi network connection evidence placed Smith's phone approximately one block from Katrina's house, although the data was consistent with the phone being in the street in front of the house. There was no Google location data available for defendant on the date of the burglary; Garbutt testified that it is possible to turn off Google location services. At 12:46 p.m., Smith's phone called defendant's phone, which was still in tower coverage area that included Katrina's house. At 12:55 p.m., there was another call between defendant's and Smith's phones, and the evidence indicated that defendant's phone was moving away from Katrina's house.

6

*Procedural History*

On August 1, 2022, the Sacramento County District Attorney's Office filed a third amended consolidated information charging defendant, Garone, Gee, Smith, and two other defendants with 37 counts primarily related to multiple burglaries and robberies occurring between December 2018 and April 2019. Defendant was charged, along with Garone, Gee, and Smith, with attempted first degree robbery (§§ 211, 664; count fourteen) and first degree burglary (§ 459; count fifteen) related to the break-in of Mayra's house. He and Smith were charged with first degree burglary of Katrina. (§ 459; count sixteen.) Defendant was also charged with unlawful possession of a firearm by a person previously convicted of a felony. (§ 29800, subd. (a)(1); count seventeen.) Additionally, count fifteen alleged that another person other than an accomplice was present in the residence during the commission of the burglary (§ 667.5, subd. (c)(21)), and count sixteen alleged that one of the principals was armed during the commission of the offense (§ 12022, subd. (a)(1)). Defendant was tried separately from his codefendants. A jury found defendant guilty as charged and the allegations true.

Defendant waived his right to a jury trial on the issue of his prior serious or violent felony convictions and admitted two such convictions. Before sentencing, the trial court found true the aggravating circumstances that defendant was personally armed with a firearm (California Rules of Court, rule 4.421(a)(2)), his prior convictions were numerous or of increasing seriousness (*id.*, rule 4.421(b)(2)), he had served a prior prison term (*id.*, rule 4.421(b)(3)), and his prior performance on probation was unsatisfactory (*id.*, rule 4.421(b)(5)). The court dismissed one of defendant's strikes pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

The trial court sentenced defendant to consecutive terms as follows: the upper term of six years for count sixteen, doubled due to the prior strike; one year for the firearm enhancement attached to count sixteen; 16 months for count fifteen, doubled due to the prior strike; eight months for count seventeen, doubled due to the prior strike; and

7

five years for each of two prior serious felony enhancements. The court also imposed the upper term of three years, doubled due to the prior strike, for count fourteen, but stayed the sentence pursuant to section 654.

Defendant timely appealed the judgment. The case was fully briefed in March 2024 and was assigned to the current panel at the end of that month.

## DISCUSSION

### I

### *Claim of Ineffective Assistance for Failing to Object to Cell Phone Location Data*

Defendant contends trial counsel was constitutionally ineffective for failing to object to expert testimony concerning his location in the hours before and after the burglaries and robbery, arguing that such testimony was inadmissible under the *Kelly* standard for admitting the results of new scientific techniques and Evidence Code sections 801 and 802.[6] Defendant, however, concedes that he cannot establish his claim of ineffective assistance. As we next explain, we agree.

A. *Procedural Background*

Before trial, the prosecution moved in limine to present various exhibits summarizing the raw data collected from the cell phone downloads in addition to the warrant returns from social media providers and cell phone carriers. At the hearing on the motion, defense counsel objected on hearsay and Evidence Code section 352 grounds to the portions of the prosecutor's presentation that did not refer to defendant's data. He

---

[6] Defendant does not expressly cite these statutes. However, he refers to the trial court's obligation to "act[ ] as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th, 747, 771-772.) The court's gatekeeper function is established by Evidence Code sections 801 and 802. (See *Saragon Enterprises, Inc.*, at p. 771.)

8

also took issue with the admission of a summary of the data. He did not object to the evidence on *Kelly* grounds.

Garbutt testified at trial that he specialized in analyzing call detail records and other geolocation analysis. In the five years before trial, he had testified as an expert on cell phone records and geolocation analysis at least 40 times in superior court. As we set forth *ante*, Garbutt used Trax to visualize the defendants' locations at relevant times. Trax imported raw data provided by cell phone carriers (including in some instances, information about the corresponding cell tower, the coverage area of the tower, and the direction the tower is facing), and location records obtained from Facebook and Google e-mail accounts (available when the cell phone's location services were enabled, and based on global positioning services (GPS) and connections to cell towers and Wi-Fi networks), and visualized that raw data on a readable map.

Garbutt explained that Trax employed quality control measures to ensure that it used original, unaltered data from the cell phone carrier, and that it updated its cell tower database records monthly. Based on ZetX's most recent studies, when a cell phone connects to a tower, there is a 95 to 96 percent likelihood that the phone is within the tower's optimal coverage area or very close to it, though the phone's precise location cannot be determined. Garbutt agreed, however, that cell tower connection data provided only a general coverage area, potentially as wide as "a mile, two miles, maybe three miles." Also, a phone could move a short distance and connect to a different cell tower because coverage areas overlap; cell phones reach out and connect to networks every three to five seconds, and they stay on the tower with the best unobstructed signal until they find a better signal, at which time they begin to communicate with the tower with the better signal.

Conversely, Garbutt testified that Google records were more accurate than cell tower data. Google GPS location data for a cell phone was accurate to within three meters, and Wi-Fi network connectivity data to within 15 to 45 meters.

9

B.  *Legal Background*

A criminal defendant is entitled to the effective assistance of counsel, whether appointed or retained.  (See *Cuyler v. Sullivan* (1980) 446 U.S. 335, 344-345; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.)  An ineffective assistance of counsel claim has two prongs.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  First, defendant must show that his counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.)  Second, defendant must show there is a reasonable probability that, but for counsel's errors, the result would have been different.  (*Id.* at pp. 217-218.)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "  (*Id.* at p. 218.)  Defendant's claim of ineffective assistance fails if he makes an insufficient showing on either one of these components.  (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

"Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.'  [Citation.]  If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' "  (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)  The defendant bears the burden of proving ineffective assistance of counsel by a preponderance of the evidence.  (*People v. Harris* (1993) 19 Cal.App.4th 709, 714.)

Defendant's claim of ineffective assistance is based on trial counsel's failure to object to the introduction of Trax evidence under the standard established by *Kelly*, *supra*, 17 Cal.3d 24.  In *Kelly*, our Supreme Court created a three-part test that governs the admissibility of expert testimony based on a new or novel scientific method or technique.  (*People v. Wash* (1993) 6 Cal.4th 215, 242, citing *Kelly*, at p. 30.)  Under the

*Kelly* test, expert testimony that relies on a new scientific technique is inadmissible unless the proponent of the evidence establishes: " '(1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used.' " (*People v. Jones* (2013) 57 Cal.4th 899, 936.)

"Not every subject of expert testimony needs to satisfy the *Kelly* test." (*People v. Peterson* (2020) 10 Cal.5th 409, 444.) The *Kelly* test applies only to expert testimony " ' "based, in whole or in part, on a technique, process, or theory which is *new* to science and, even more so, to the law." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 470.) Under *Kelly*, the jury must be protected from such techniques until "the pertinent scientific community no longer views them as experimental or of dubious validity," particularly where "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156; see *Cowan*, at p. 470 [the *Kelly* test " 'is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not' "].) Accordingly, a trial court must make an initial determination of whether a technique is meaningfully distinct from existing techniques, and therefore requires a *Kelly* hearing. (*Peterson*, at p. 444; *People v. Jackson* (2016) 1 Cal.5th 269, 316 ["To be new, a technique must be meaningfully distinct from existing techniques"].) The court must also consider "whether the technique is one whose reliability would be difficult for laypersons to evaluate." (*Peterson*, at p. 444.)

If the trial court determines that the *Kelly* test applies, "[e]stablishing reliability is the overriding factor when a party seeks to admit evidence based on a new scientific technique." (*People v. Fortin* (2017) 12 Cal.App.5th 524, 531.) "Under the *Kelly* test, the admissibility of evidence obtained by use of a scientific technique does not depend upon proof to the satisfaction of a court that the technique is scientifically reliable or

11

valid. [Citation.] Because courts are ill suited to make such determinations, admissibility depends upon whether the technique is generally accepted as reliable in the relevant scientific community." (*People v. Bolden* (2002) 29 Cal.4th 515, 546; *People v. Azcona* (2020) 58 Cal.App.5th 504, 511.) General acceptance means "a consensus drawn from a typical cross-section of the relevant, qualified scientific community." (*People v. Leahy* (1994) 8 Cal.4th 587, 612.) Unanimous acceptance is not required; " '[r]ather, the test is met if use of the technique is supported by a clear majority of the members of that community.' " (*Ibid*.) "*Kelly* calls for the proponent of scientific evidence to provide evidence more akin to a survey of scientists and laboratories than a 'nuts and bolts' showing of how and why the technique works." (Chin et al., Forensic DNA Evidence: Science and the Law (The Rutter Group June 2021 update) § 11:1, citing *People v. Shirley* (1982) 31 Cal.3d 18, 55 [under *Kelly*, a court is not required to decide whether a methodology is reliable as a matter of " 'scientific fact,' " but simply whether it is generally accepted as reliable by the relevant scientific community].)

Defendant acknowledges that in applying *Kelly*, a court holds an "evidentiary hearing at which both sides . . . present relevant evidence on the admissibility of the expert testimony." A trial court may also consider articles, studies, and research relevant to general acceptance. (*People v. Shirley, supra*, 31 Cal.3d at p. 56.) Such writings, in this context, are viewed "as 'evidence,' not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community." (*Ibid*.)

C. *Analysis*

At the outset, by claiming ineffective assistance of counsel, defendant implicitly acknowledges that he forfeited his claim by failing to object to the evidence on *Kelly* grounds, to Garbutt's qualifications as an expert, or to the foundation of Garbutt's opinions. (*People v. Ochoa* (1998) 19 Cal.4th 353, 414 [failure to object to evidence on *Kelly* grounds in the trial court means *Kelly* claim not preserved for appeal].)

12

Further, defendant concedes he cannot demonstrate ineffective assistance because (due to counsel's failure to object) there was no evidentiary hearing at which both sides had the opportunity to present evidence on the admissibility of historical cell phone location data. In other words, while defendant cites several articles for the proposition that Trax evidence has not gained general acceptance in the relevant scientific community,[7] that assertion is based on a one-sided view supported solely by materials he presents on appeal, and not a "consideration of the views of a typical cross-section of the scientific community." (*Kelly*, *supra*, 17 Cal.3d at p. 37.) While this court would consider such materials had there been a *Kelly* hearing in the trial court (see *People v. Reilly* (1987) 196 Cal.App.3d 1127, 1134 [noting that "the reviewing court undertakes a more searching review -- one that is sometimes not confined to the record," thus allowing for consideration of scholarly writings bearing on the question of general acceptance not presented in the trial court]), here there was no such hearing. Had defendant objected to the evidence on *Kelly* grounds, the prosecution would have had the opportunity to rebut any argument that the techniques at issue were new, and make the showings required by *Kelly* (and the reliability showings required by Evidence Code sections 801 and 802) if necessary, by presenting testimony and other materials pertinent to the *Kelly* analysis and the technology involved. In the absence of a preliminary decision by the trial court regarding the novelty of the scientific technique, an evidentiary hearing at which the

---

[7] Defendant cites several publications for that proposition, including Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone* (2011) 18 Rich. J.L. & Tech. 3; Cherry, et al., *Cell Tower Junk Science* (2012) 95 Judicature 151; Jovanovic & Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts* (2022) 10 Inst. Elec. & Elecs. Eng'rs Access 28037; Kirkham, *Rejecting Historical Cell Site Location Information as Unreliable Under Daubert and Rule 702* (2019) 50 U. Tol. L.Rev. 361; Note, *Sleeping Gate-Keepers: Challenging the Admissibility of Cell Phone Forensic Evidence Under Daubert* (2011) 11 J. High Tech. L. 365; Saxe, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence* (2020) 19 U.N.H. L. Rev. 133.

People could present evidence, or an appellate opinion concluding that Trax is inadmissible expert evidence, we agree with defendant that he cannot establish a reasonable probability that the result would have been different had counsel objected.

For similar reasons, defendant cannot establish that trial counsel fell below a reasonable attorney standard by failing to object. The record " 'sheds no light on why counsel acted or failed to act in the manner challenged,' " counsel was not " 'asked for an explanation and failed to provide one,' " and it is not the case that " 'there simply could be no satisfactory explanation.' " (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 746.) For example, counsel may have researched Trax evidence or consulted with experts in the field and reached the conclusion that Trax has been accepted in the scientific community. Indeed, we note that Garbutt testified at trial that he has testified at least 40 times in superior court in the five years before the trial herein occurred. While we take no position on whether Trax evidence has gained general acceptance in the scientific community, we cannot say that counsel had no satisfactory explanation for failing to object. Therefore, we agree with defendant that he cannot establish that counsel's performance fell below a reasonable attorney standard when he failed to object to the evidence on *Kelly* grounds.[8]

## II

### *Insufficient Evidence of Firearm Possession Claim*

Defendant contends insufficient evidence supports his conviction for unlawful possession of a firearm by a person previously convicted of a felony (§ 29800, subd. (a)(1); count seventeen), the arming enhancement attached to count sixteen (§ 12022,

---

[8] Defendant argues that counsel's deficient performance would be demonstrated if legal authority supporting his position "appears during the pendency of this appeal." We need not and do not address that claim because, as of the date of this opinion, no such authority has appeared.

14

subd. (a)(1)), and the firearm sentence aggravating factor (Cal Rules of Court, rule 4.421(a)(2)) because they were based on "indistinct" surveillance video from the burglary of Katrina's house. We disagree.

A. *Legal Background*

"In addressing a claim of insufficient evidence to support a conviction, this court ' "reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.] 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Jackson*, *supra*, 1 Cal.5th at p. 345.) "The jury is entitled to draw reasonable inferences based on the evidence [citation], and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise." (*People v. Campbell* (2020) 51 Cal.App.5th 463, 484.) " ' "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." ' " (*Ibid.*) Reversal for insufficiency of the evidence is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

B. *Analysis*

Defendant does not contend insufficient evidence supports his burglary conviction related to the break-in of Katrina's house, or the finding that he was the person appearing in the surveillance video. Instead, he admits the object he was holding in the video

15

"could be consistent with a Glock handgun," but argues it was too indistinct to constitute substantial evidence that he possessed a firearm.

Having reviewed the surveillance video and viewing the evidence in the light most favorable to the prosecution, we disagree. The surveillance video showed defendant enter the house and take out what appears to be a handgun from his right pocket. He then moved the gun toward the middle of his body and held the barrel with his left hand, appearing to rack the slide. When a dog entered the frame, he turned and briefly aimed the gun at the dog.

The surveillance video does not conclusively rule out the possibility that defendant possessed only a replica of a handgun. However, in the related context of robbery, a panel of this court observed that "jurors 'may draw an inference from the circumstances surrounding the robbery that the gun was not a toy.' " (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1437.) As the court observed in *Monjaras*, "Common sense and common experience illustrate that little has changed since 1927, when a court astutely observed that criminals 'do not usually arm themselves with unloaded guns when they go out to commit robberies' (*People v. Hall* (1927) 87 Cal.App. 634, 635-636). If anything, with the proliferation of handguns in America since 1927, robbery has become a more dangerous crime today because of the greater likelihood that victims will protect themselves by using deadly force against the robber. Consequently, it is all the more unlikely today that robbers use toy guns or unloaded or inoperable weapons. [¶] As the old saying goes, 'if it looks like a duck, and quacks like a duck, it's a duck.' " (*Ibid.*) The same reasoning applies to residential burglaries. Defendant was entering a house for the purpose of stealing from the house's residents, a dangerous endeavor carrying a risk that he would encounter armed resistance. Additionally, defendant's act of aiming the gun at the dog supports the finding that the gun was real. Unlike a person, a dog is unlikely to be impressed by a convincing replica of a gun; the only obvious reason to aim a gun at a dog is to be able to shoot it, should it pose a threat. The jury was entitled to

16

infer from the context of the crime and defendant's conduct that he had armed himself with a loaded handgun, not a toy or some other item merely resembling a handgun.

III

*Claim of Ineffective Assistance for Failing to Object to Photographic Evidence*

Defendant contends he was denied effective assistance of counsel because trial counsel failed to object to photographic evidence showing defendant possessing a firearm on a date before the charged offenses. The prosecution submitted evidence of four photographs that were obtained from defendant's cell phone. The first image, which was created on the cell phone on February 3, depicted a full-sized Glock handgun. The next two images were created on defendant's cell phone on February 12 and depicted defendant holding a Glock handgun to his head. The fourth photograph, also created on defendant's cell phone on February 12, depicted a compact Glock handgun.

Defendant argues that the evidence was inadmissible and would have been excluded had counsel objected, and he was prejudiced because the evidence tended to show that he was the sort of person who might possess a handgun, making it more likely that the jury would find that he possessed a functioning handgun during the Katrina burglary. He further argues that the evidence was inflammatory because a photograph of him holding a gun to his head on social media would influence the jury to view him as a dangerous person.

Defendant has failed to establish prejudice. As we discussed *ante*, defendant was captured on surveillance video possessing what appeared to be a handgun, and the jury was entitled to infer based on his conduct (appearing to rack the slide of the gun and briefly aiming the gun at the dog) and the context of the possession (a residential burglary) that he possessed a real handgun. Because the evidence showed defendant possessing what appeared to be a handgun in a dangerous circumstance in which a person might typically carry a gun, there was no reasonable probability that he would have

17

achieved a more favorable result had evidence of him possessing a handgun in other contexts been excluded.

We also disagree with defendant's assertion that the photographic evidence was inflammatory. Evidence of defendant holding a gun to his head is no more inflammatory than the evidence of the charged offenses. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [because testimony about prior bad acts "was no stronger and no more inflammatory than the testimony concerning the [current] offenses," unlikely that the jury's passions were inflamed by the prior acts evidence].)

IV

*Insufficient Evidence of Attempted Robbery Claim*

Defendant contends insufficient evidence supports his conviction for attempted robbery related to the break-in of Mayra's house. Defendant's liability for attempted robbery was based on an aider and abettor theory, and accordingly the People were required to prove that he knew of and shared the direct perpetrator's intent to commit a robbery. Defendant argues that no evidence proved the defendants knew the house was occupied at the time they entered, and therefore insufficient evidence supports the finding that he intended to commit a robbery. We agree.[9]

A. *Additional Background*

Following the jury's verdicts but before sentencing, defendant filed a *Romero* motion requesting that the trial court strike his prior strike convictions.[10] The prosecutor responded that defendant "falls squarely within the spirit of the three strikes law." He

---

[9] Defendant also argues insufficient evidence showed that there was any direct confrontation between any perpetrator and any victim. Because we conclude insufficient evidence proved his intent to commit robbery, we need not and do not address that argument.

[10] On appeal, defendant highlights comments the trial court made during the hearing on that motion; therefore, we will discuss the arguments preceding the court's comments.

18

argued in part that the burglaries at issue in this case were "aggravated burglaries for different reasons in each one." Referring to the burglary of Mayra's house, he argued that while the evidence indicated the defendants targeted the wrong house, "what is clear is that they knew the people were going to be home." He noted that the first thing one of the defendants did upon entering the home was to threaten to kill the residents if they moved. The prosecutor added that the jury found defendant guilty of attempted robbery, which required the jury to find that the defendants knew the house was occupied at the time of entry.

Defendant responded that no evidence demonstrated that the defendants knew anyone was home, and that they left the house immediately after hearing one of the house's occupants say something or scream.

The trial court observed that the issue was whether the defendants targeted the house knowing it was occupied because, if not, it "seem[ed] to [the court] that the case was a group of individuals." It added, "The question for us here is did they know -- did [defendant] know that that home was occupied upon the entry, upon the burglary. And then thereafter did the robbery take place? That's sort of the impression I got from the evidence. To me it is a question -- there is a question as to whether or not [defendant] knew there were people home upon the entry in the home."

The prosecutor argued that the evidence showed that the defendants, after one of them threatened to kill the residents, realized that they had the wrong house and that the target of the crime was not there, and they left. He asserted that there was a "clear inference they entered this home with the intention to do a robbery as opposed to entering the home with no intention to do a robbery, and then suddenly deciding -- I mean, attempting to do a robbery inside the home, but then abandoning that attempt with no other intervening factor."

The trial court did not "consider the evidence to be quite that clear." The court observed, "there's ambiguity in it as to whether or not they knew someone was in the

19

home at the time of entry. There was certainly no clear evidence presented by the prosecution of the prosecution's argument here today. [¶] Inferences have to be drawn, and those inferences are in question, of course that would never reach the reasonable doubt -- beyond a reasonable doubt standard. So I'm not certain that they actually -- the argument in terms of the [*Romero*] motion is -- I'm not certain that the argument is as solid as the People may think it is, or at least to me it's not as clear based on the evidence as I recall it. The issue was never really squarely addressed in the evidence. [¶] It wasn't at issue. It wasn't within -- didn't have to be proved. And then that would explain why that is not proved, the way it's argued here by both sides."

B. *Law*

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "[E]very robbery which is perpetrated in an inhabited dwelling house" constitutes "robbery of the first degree." (*Id.*, subd. (a).)

A criminal attempt consists of two elements: the specific intent to commit a crime and "a direct but ineffectual act done toward its commission." (§ 21a.) Case law describes the second element as an "overt act" requirement. "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1021, quoting *People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8.) "[P]reparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made." (*People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) Therefore, attempted robbery requires the specific intent to commit robbery and an overt act toward its commission that goes beyond planning or preparation.

20

A person may be guilty of a crime either as a direct perpetrator, or as an aider and abettor. "To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage[ ] him [or her] by words or gestures.' [Citations.] In addition, except under the natural-and-probable-consequences doctrine [citations], which is not implicated on the facts presented here, the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted [robbery] as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to [commit robbery] and with the purpose of facilitating the direct perpetrator's accomplishment of the intended [robbery]—which means that the person guilty of attempted [robbery] as an aider and abettor must intend to [commit robbery]." (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)

C. *Analysis*

During closing argument, the prosecutor explained that he was asking the jury to find defendant guilty of attempted robbery based on his role as an aider and abettor to the direct perpetrator--i.e., the person who threatened the house's residents. That is because the evidence did not establish the identity of the direct perpetrator, and it could not be proved beyond a reasonable doubt that defendant entered the house. Accordingly, to prove the attempted robbery charge, the prosecution was required to prove beyond a reasonable doubt that the defendants knew the house was occupied before they entered it, and that they intended to commit a robbery once inside. If the direct perpetrator

21

formulated the intent to commit robbery only after entering the house, then the evidence would be insufficient to show that defendant--who could not be shown to have gone into the house--intended to commit robbery.[11] (See *People v. Lee*, *supra*, 31 Cal.4th at pp. 623-624.) As the trial court put it, if the defendants did not know the house was occupied before entering it, "the case was a group of individuals" without a shared intent to commit robbery.

We agree with defendant that the evidence was insufficient to show that the defendants knew the house was occupied at the time they entered. First, the communications between the defendants involved committing a burglary, not a robbery. The record does not include any discussion between the defendants about a plan for subduing the house's residents or for managing the residents while the remaining perpetrators committed the theft. Rather, the evidence demonstrated that the defendants were staking out the house to ensure that it was *unoccupied* before entering. About an hour before the burglary, Gee texted Garone his hope that "he left all of his jewelry," to which Garone replied that "they went to snowboard." Gee noted that Smith had "been there for a while. No movement, no nothing." Garone, appearing to agree that no one was in the house, replied, "That's how it was the other day when I was there." Gee replied, "Got to be gone. Someone is ballin' that hard, you would see movement. We both know that." The only reasonable interpretation of the exchange between Gee and Garone is that they believed the house was unoccupied.

The perpetrators' conduct after the initial entry also fails to provide substantial evidence that they knew the house was occupied before entering it. The Attorney General points to evidence that one of the perpetrators threatened the occupants.

---

[11] Defendant "[a]ssum[es] that [he] was properly convicted of the burglary of [Mayra's] house." We agree that substantial evidence supports the finding that defendant participated in the burglary of Mayra's house.

However, while Mayra initially testified that her mother began screaming *after* the man threatened them, she clarified on cross examination that her mother began screaming *immediately* upon hearing glass breaking, and she heard the man's voice threaten them "*[w]hile* [her mother] was screaming." (Italics added.) Noting the apparent inconsistency in Mayra's testimony, defense counsel asked her to clarify, and Mayra repeated that she heard the man's voice "*while* [her mother] was screaming." (Italics added.) Thus, the direct perpetrator's threat is not substantial evidence that the defendants knew the house was occupied before they entered because the evidence showed the perpetrator threatened the residents only after hearing Mayra's mother screaming.

The Attorney General also points out that there were two cars parked in the driveway at the time of the crime, and the crime occurred at 3:00 a.m., when occupants would typically be home. However, these facts do not constitute substantial evidence that the defendants knew the house was occupied. There is no evidence that the defendants observed the occupants arrive at the house in either of the cars, which would have informed them that the occupants were inside the house. Nor did they observe any activity in the house, which they appeared to have expected based on the text conversation between Gee and Garone set forth *ante*. While cars parked in the driveway could have reasonably given the defendants pause as to whether the house might be occupied--as the evidence suggests it did--it is speculative to infer the intent to commit robbery based merely on cars parked in the driveway. "A conviction based on such pure speculation and guess-work cannot stand." (*People v. Lewis* (1963) 222 Cal.App.2d 136, 149.)

Viewing the evidence in the light most favorable to the judgment, no rational jury could have found that defendant committed an attempted robbery, and therefore we reverse this count of conviction. "[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial

court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  Accordingly, remand for full resentencing is appropriate.  We note that because we reverse based on insufficient evidence, the People may not elect to retry defendant on this count on remand.  (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].)

V

*Section 654*

Defendant contends the sentence for unlawful possession of a firearm should have been stayed pursuant to section 654.  We disagree.

Section 654, subdivision (a) provides in relevant part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  " 'Since its origin in 1872, the Penal Code has prohibited multiple punishment for a single "act or omission."  (§ 654.)  Although our interpretation of that provision has varied somewhat over the years, we have consistently held that it bars imposing [multiple] sentences for a single act or omission, even though the act or omission may violate more than one provision of the Penal Code.  [Citation.]  Since 1962 we have interpreted section 654 to allow multiple convictions arising out of a single act or omission, but to bar multiple punishment for those convictions.  [Citations.]  . . .  [E]xecution of the sentence for one of the offenses must be stayed.' "  (*People v. Mesa* (2012) 54 Cal.4th 191, 195.)

"Case law establishes the guidelines for applying section 654 in the context of a conviction for possession of a prohibited weapon.  ' "[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved.  On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal

24

possession of the [weapon] has been held to be improper where it is the lesser offense." ' " (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217.)

"The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence. [Citation.] 'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence.' " (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

In *People v. Venegas* (1970) 10 Cal.App.3d 814, a section 654 stay was required where the defendant was convicted of assault with a deadly weapon (a gun) and possession of the gun by a felon, and the evidence showed the unlawful possession of the gun only at the time the defendant shot the victim. (*Venegas,* at pp. 820-821 [there was evidence that the defendant and the victim struggled for the gun before the defendant shot the victim]; see also *People v. Bradford* (1976) 17 Cal.3d 8, 22-23 [section 654 applies in assault with a deadly weapon and possession of a firearm by a felon case where the defendant wrested away the gun of a highway patrol officer and shot at the officer with the gun].)

In contrast, in *People v. Jones* (2022) 103 Cal.App.4th 1139 (*Jones*), section 654 was held inapplicable where the defendant was convicted of shooting at an inhabited dwelling and of being a felon in possession of a firearm, and the record supported the trial court's implied findings that the defendant arrived at the scene of his primary crime already in possession of the firearm. (*Jones*, at pp. 1142, 1145-1149.) The court observed that "[i]t strains reason to assume [the defendant] did not have possession for some period of time before firing shots at [the victim's] home. Any other interpretation would be patently absurd. [The defendant] committed two separate acts: arming himself with a firearm, and shooting at an inhabited dwelling." (*Id.* at p. 1147; see also *People v. Wynn*, *supra*, 184 Cal.App.4th at pp. 1216-1218 [separate punishment for possession of

25

deadly weapon and assault with a deadly weapon properly imposed where the defendant possessed the weapon before the assaults occurred]; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413-1414 [§ 654 did not prohibit multiple punishments where the defendant was convicted of two counts of armed robbery and one count of being a felon in possession of a handgun because a justifiable inference from the evidence was the defendant's possession of the handgun was not merely simultaneous with the robberies but continued before, during and after those crimes].)

We agree with the more restrictive test set forth in *Jones*, *supra*, 103 Cal.App.4th 1139. That test forecloses section 654 applicability, in the context of firearm possession by a felon, if there is any evidence the felon possessed the firearm before or after the primary crime, thus evidencing an independent possessory intent. (*Jones*, at pp. 1144-1146.) The felon in possession of a firearm offense is committed the instant the felon in any way has a firearm within his control. (*Id.* at pp. 1145-1146.)

Thus, we reject defendant's argument that "[w]hile it is possible that [he] came to the scene armed, it is by no means clear that he did." The inference that defendant arrived at the scene of the burglary already armed with a loaded handgun is reasonable and supported by substantial evidence. Surveillance video from the crime showed defendant entering the house and removing a handgun from his pocket. There is nothing in the video to suggest that defendant found the handgun in the house, or anywhere other than on his own person. As in *Jones*, it "strains reason" to conclude defendant did not possess the firearm for a period of time before and after the burglary. Section 654 did not apply to count seventeen because defendant's commission of the crime of possession of a firearm by a felon was complete when he possessed the gun prior to the burglary. (*Jones*, *supra*, 103 Cal.App.4th at p. 1147.)

26

## DISPOSITION

Defendant's conviction for attempted robbery in count fourteen is reversed. The sentence is vacated and the matter remanded for a full resentencing. In all other respects, the judgment is affirmed.


＿＿＿＿＿＿/s/＿＿＿＿＿＿＿＿
Duarte, J.


We concur:


＿＿＿＿＿＿/s/＿＿＿＿＿＿＿＿
Earl, P. J.


＿＿＿＿＿＿/s/＿＿＿＿＿＿＿＿
Krause, J.

27